T.C. Memo. 1996-112

UNITED STATES TAX COURT

JANE O. KOSMAN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 27091-93.          Filed March 11, 1996.

<u>James M. Bausch</u>, <u>Larry A. Holle</u>, and <u>Terry R. Wittler</u>, for petitioner.

<u>Albert B. Kerkhove</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, <u>Judge</u>:  Respondent determined that petitioner Jane O. Kosman has gift tax deficiencies of $158,136 for 1986 and $15,157 for 1987.

The issue for decision is the fair market value of Kosman, Inc., stock that petitioner gave to her children on September 30,

1986, and March 31, 1987. To decide the value of that stock, we must decide the following issues:

(1) The value of Kosman, Inc.'s 12,834 shares of Scottsbluff National Corp. stock. We hold that it was $3,278,009 on September 30, 1986, and $3,530,454 on March 31, 1987.

(2) The value of Kosman, Inc.'s 2,000 shares of Western National Bank stock. We hold that it was $120,000 on September 30, 1986, and $144,000 on March 31, 1987.

(3) The value per share before discounts of Kosman, Inc., voting and nonvoting common stock. We hold that it was $219.80 on September 30, 1986, and $247.45 on March 31, 1987.

(4) The appropriate discounts to apply in valuing the Kosman, Inc., stock that petitioner gave to her children. We apply a minority interest discount of 10 percent and a lack of marketability discount of 15 percent to the voting and nonvoting shares, and a 4-percent discount for lack of voting power to the nonvoting shares.

The fair market value of Kosman, Inc., stock that petitioner gave to her children after applying the discounts in (4) to the value per share of Kosman, Inc.'s stock in (3) is as follows:

| Date | Stock | Petitioner's Expert | Respondent's Experts | Holding |
|------|-------|---------------------|----------------------|---------|
| 9/30/86 | Voting common | $116.24 | $294 | $164.85 |
| | Nonvoting common | 100.74 | 282 | 156.06 |

| 3/31/87 | Voting common | 131.76 | 294 | 185.58 |
| | Nonvoting common | 114.19 | 282 | 175.69 |

Section references are to the Internal Revenue Code in effect for the years in issue.  Rule references are to the Tax Court Rules of Practice and Procedure.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

1.  <u>Petitioner</u>

Petitioner lived in Scottsbluff, Nebraska, when she filed the petition in this case.

In 1986 and 1987, the stock of Scottsbluff National Corp. was held by members of the Kosman, Lindig, and Ostenberg-Fleisbach families, and by current and former employees and directors of Scottsbluff National Bank.  Harve Ostenberg formerly was the majority shareholder and president of Scottsbluff National Bank.  Harve Ostenberg and his first wife are petitioner's parents.  The Lindig family members inherited their stock in Scottsbluff National Corp. from William Ostenberg. William Ostenberg was Harve Ostenberg's brother and a shareholder of Scottsbluff National Bank.  The members of the Ostenberg-Fleisbach family derived their stock in Scottsbluff National Bank from C.S. Ostenberg and C.H. Fleisbach.  C.S. Ostenberg and C.H. Fleisbach were sons of Harve Ostenberg's second wife and her first husband.

2.   <u>Scottsbluff National Bank</u>

Scottsbluff National Bank was chartered in 1909.  It was owned by Harve and William Ostenberg.  From 1909 to 1944, Harve Ostenberg owned a majority of the outstanding shares of stock in Scottsbluff National Bank and served as president.  Henry Kosman (petitioner's husband) was the bank's president from 1951 to 1982.  H.H. Kosman (petitioner's son) has been the bank's president from 1991 until the time of the trial in this case.

Before 1986, the main office of Scottsbluff National Bank was in downtown Scottsbluff, Nebraska.  It also had a drive-in branch office in downtown Scottsbluff and another branch in eastern Scottsbluff.  In 1987, Scottsbluff National Bank acquired another building next to its main building.  Both buildings were then remodeled.  The remodeling was completed in 1989.

3.   <u>Western National Bank</u>

Western National Bank was chartered in 1965.  The shareholders of Scottsbluff National Bank were instrumental in forming Western National Bank.  Western National Bank and Scottsbluff National Bank had substantially the same shareholders.  In 1986 and 1987, Western National Bank's main office was in Scottsbluff.  It also had a drive-in branch office in Scottsbluff.

4.    Scottsbluff National Corp.

Scottsbluff National Corp. was formed in 1974 as the parent holding company of Scottsbluff National Bank.  Scottsbluff National Bank became the wholly owned subsidiary of Scottsbluff National Corp. when the bank's shareholders exchanged their shares of the bank's stock for shares of the parent holding company's stock.  From 1974 to 1987, Scottsbluff National Corp. conducted no material business operations and held no assets other than its stock in Scottsbluff National Bank.

5.    Kosman, Inc.

Before 1980, banks in Nebraska could not have branch offices.  By 1980, however, banking statutes were amended to allow banks to have branch offices and to permit formation of multibank holding companies.

Kosman, Inc., was incorporated around July 1986 to serve as a holding company for the Kosman family's interest in Scottsbluff National Corp.  At all times pertinent to this case, the outstanding shares of stock of Kosman, Inc., consisted of 5,000 shares of voting common stock, 5,000 shares of nonvoting common stock, and 12,000 shares of voting preferred stock.

In 1986 and 1987, Kosman, Inc.'s only assets were its stock in Scottsbluff National Corp. and Western National Bank.  During this period, Kosman, Inc., owned 12,834 (32.085 percent) of the 40,000 shares of stock in Scottsbluff National Corp. and 2,000

(10 percent) of the 20,000 shares of stock in Western National Bank. Scottsbluff National Corp. owned 100 percent of the stock of Scottsbluff National Bank.

6.  Gering National Bank

Gering National Bank in Gering, Nebraska, was declared insolvent by the Federal Deposit Insurance Corp. (FDIC) around 1986. The towns of Gering and Scottsbluff are adjacent.

On August 1, 1986, Scottsbluff National Bank absorbed the Gering National Bank. Scottsbluff National Bank also acquired the real estate, fixtures, and furniture of Gering National Bank from the FDIC at the end of 1986. Scottsbluff National Bank paid a $15,000 premium to the FDIC to acquire Gering National Bank, which had total deposits of $65 million. Following the acquisition, Gering National Bank's office became a branch office of Scottsbluff National Bank. After it absorbed Gering National Bank in 1986, Scottsbluff National Bank had about 120 employees.

7.  Acquisition of Western National Bank by Scottsbluff National Corp.

In October 1986, the board of directors of Scottsbluff National Corp. approved a plan to acquire Western National Bank. The plan was approved by the shareholders of both companies and by the appropriate regulatory authorities between October 1986 and June 30, 1987. The two banks merged on July 1, 1987. Western National Bank's shareholders received one share of

Scottsbluff National Corp. stock for each 3.3 shares of Western National Bank stock.

Western National Bank's main office became a branch office of Scottsbluff National Bank, and the branch office of Western National Bank was closed. As a result of the merger, about 20 employees of Western National Bank became employees of Scottsbluff National Bank.

8. <u>Nebraska Economy</u>

   a. <u>Statewide</u>

From late 1986 to early 1987, the Nebraska economy was fair to poor. The State's economy grew more slowly than the nation's economy because of low prices for agricultural commodities produced in Nebraska. The average per-acre value of farm land in Nebraska fell from $730 in 1982 to $335 in 1987, a decline of 54 percent over 5 years.

   b. <u>Northwestern Nebraska</u>

From 1984 to 1986, per capita income rose 11.61 percent for the country and 8.72 percent in northwestern Nebraska (which includes Scottsbluff). From 1980 to 1986, total receipts for farm products in northwestern Nebraska decreased 11.2 percent before adjustment for inflation.

Business conditions were poor in northwestern Nebraska during the middle 1980's. During 1986 and 1987, uncertainty over whether the Chicago & Northwestern R.R. Co.'s railway line would

continue to operate between Merriman and Crawford cast a cloud over the economic future of northwestern Nebraska.

    c.  <u>Scottsbluff Area</u>

There was little reason to be optimistic about the Scottsbluff area economy during the last half of 1986 and the first half of 1987.  In the early 1980's, the Gering, Scottsbluff, and Terrytown area had five commercial banks and two savings and loans.  Two of the banks failed in 1986.  Both of the savings and loans failed later.  The Scottsbluff area suffered the highest failure rate of financial institutions for any market area in Nebraska during the 1980's.  The financial outlook for Scottsbluff National Bank and Western National Bank was fair to poor in 1986.

9.  <u>Financial Condition of Scottsbluff National Bank in 1986-1987</u>

From 1981 to 1986, Scottsbluff National Bank had income, expenses, assets, liabilities, and stockholders' equity as follows:

Consolidated Income Statements for
Scottsbluff National Corp.
Years Ended December 31

|  | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 |
|---|---|---|---|---|---|---|
| Interest income | $10,906,440 | $12,318,774 | $11,962,853 | $12,777,147 | $12,410,738 | $14,307,419 |
| Interest expense | 6,786,820 | 8,042,931 | 7,804,350 | 8,195,381 | 7,361,058 | 8,233,708 |
| Net interest income | 4,119,620 | 4,275,843 | 4,158,503 | 4,581,766 | 5,049,680 | 6,073,711 |
| Loan loss | 156,071 | 664,383 | 426,334 | 590,135 | 1,540,000 | 1,320,000 |

| | | | | | |
|---|---|---|---|---|---|
| Net interest income after loan loss provision | 3,963,549 | 3,611,460 | 3,732,169 | 3,991,631 | 3,509,680 | 4,753,711 |
| Noninterest income | 502,049 | 521,096 | 513,209 | 593,281 | 654,964 | 1,043,446 |
| Noninterest expense | 2,028,292 | 2,219,002 | 2,333,675 | 2,342,746 | 2,632,959 | 3,589,691 |
| Income before taxes & securities trans. | 2,437,306 | 1,913,554 | 1,911,703 | 2,242,166 | 1,531,685 | 2,207,466 |
| Income taxes | 785,000 | 380,000 | 340,000 | 318,000 | 43,000 | 295,000 |
| Income before securities trans. | 1,652,306 | 1,533,554 | 1,571,703 | 1,924,166 | 1,488,685 | 1,912,466 |
| Securities trans. net of taxes | (50,598) | 262 | - 0 - | - 0 - | - 0 - | - 0 - |
| Net income | 1,601,708 | 1,533,816 | 1,571,703 | 1,924,166 | 1,488,685 | 1,912,466 |

Consolidated Balance Sheets for
Scottsbluff National Corp.
December 31

| | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 |
|---|---|---|---|---|---|---|
| Cash & due from banks | $7,486,850 | $5,665,233 | $7,899,122 | $8,074,581 | $8,296,300 | $15,300,513 |
| Investment securities | 22,101,096 | 28,127,111 | 29,526,735 | 36,082,308 | 44,489,796 | 64,839,147 |
| Fed. funds sold & securities purchased u/a resell | 8,334,000 | 9,694,000 | 12,574,000 | 6,300,000 | 4,550,000 | 11,500,000 |
| Due from FDIC | - 0 - | - 0 - | - 0 - | - 0 - | - 0 - | 33,392,252 |
| Net loan | 56,705,401 | 59,221,104 | 64,159,394 | 66,532,321 | 65,078,845 | 75,014,696 |
| Premises & equipment | 905,123 | 823,939 | 776,627 | 711,640 | 676,957 | 1,255,549 |
| Investment in direct financing leases | - 0 - | - 0 - | - 0 - | - 0 - | 506,684 | 386,869 |
| Other real estate owned | - 0 - | - 0 - | - 0 - | - 0 - | 2,229,106 | 2,190,305 |
| Other assets | 2,055,449 | 2,850,616 | 3,040,321 | 3,941,466 | 2,843,590 | 5,008,152 |
| Total assets | 97,587,919 | 106,382,003 | 117,976,199 | 121,642,316 | 128,671,278 | 208,887,483 |
| Total deposits | 84,779,882 | 91,969,448 | 102,308,473 | 105,620,830 | 111,666,690 | 190,521,460 |
| Total liabilities | 89,268,848 | 96,689,116 | 106,871,609 | 109,053,560 | 115,013,837 | 193,817,576 |
| Total stockholders equity | 8,319,071 | 9,692,887 | 11,104,590 | 12,588,756 | 13,657,441 | 15,069,907 |
| Total liabilities & stockholders equity | 97,587,919 | 106,382,003 | 117,976,199 | 121,642,316 | 128,671,278 | 208,887,483 |

Scottsbluff National Bank was in fair to good financial condition on December 31, 1986.  In December 1986, Scottsbluff National Bank had a secure equity position but a below average loan loss reserve.  The bank's high profitability in the early 1980's may have been partly because it had made an insufficient allowance for loan losses.  Scottsbluff National Bank was well capitalized, consistently profitable, and efficiently run, but its loan losses were cause for some concern.

On December 31, 1986, Scottsbluff National Bank was the seventh largest bank in Nebraska.  Seven of the 10 largest Nebraska banks were located in Lincoln or Omaha, Nebraska. On December 31, 1986, Scottsbluff National Bank had a loan-to-deposit ratio of 40.21 percent, the lowest of the 10 largest banks in Nebraska.  The average loan-to-deposit ratio for the 10 banks was 58.7 percent.  Of the 10 largest banks in Nebraska, Scottsbluff National Bank had the third highest percentage of agricultural loans and the fourth highest percentage of nonperforming loans.

10.  Financial Condition of Western National Bank in 1984-1987

From 1984 to 1986, Western National Bank had income, expenses, assets, liabilities, and equity capital as follows:

Income Statements of Western National Bank
Years Ended December 31

|  | 1984 | 1985 | 1986 |
|---|---|---|---|
| Operating expenses | $2,732,952 | $2,899,963 | $2,466,955 |
| Income (loss) before income taxes & securities gains | 295,747 | (119,316) | 116,943 |
| Income tax provision (credit) | 66,699 | (105,979) | 6,000 |
| Income (loss) before securities gains | 229,048 | (13,337) | 110,943 |
| Securities gains | 434 | 4,697 | 2,042 |
| Net income (loss) | 229,482 | (8,640) | 112,985 |

Balance Sheets of Western National Bank
Years Ended December 31

|  | 1984 | 1985 | 1986 |
|---|---|---|---|
| Cash & due from banks | $2,368,946 | $1,868,176 | $1,460,320 |
| U.S. securities | 2,755,558 | 3,883,924 | 5,406,542 |
| U.S. agencies | 399,750 | 249,750 | 249,750 |
| State & municipal obligations | 1,852,372 | 1,430,747 | 1,196,568 |
| Federal Reserve stock & corp. stock | 10,800 | 10,800 | 10,800 |
| Federal funds sold & securities purchased u/a to resell | 3,400,000 | 5,200,000 | 7,900,000 |
| Net loans | 14,470,239 | 12,813,498 | 11,013,761 |
| Bank premises & equipment | 285,455 | 242,245 | 209,999 |
| Other assets | 831,193 | 733,031 | 609,622 |
| Total assets | 26,374,313 | 26,432,171 | 28,057,362 |
| Total deposits | 23,598,064 | 23,760,548 | 25,357,602 |
| Other liabilities | 554,840 | 459,660 | 407,191 |
| Total liabilities | 24,152,904 | 24,220,208 | 25,764,793 |
| Total equity capital | 2,221,409 | 2,211,963 | 2,292,569 |
| Total liabilities and equity capital | 26,374,313 | 26,432,171 | 28,057,362 |

Western National Bank's income was uneven from 1982 to 1986. Its income dropped from the previous year in 1983 and 1985.

These changes were primarily due to its declining loan income. The decline in loan income was closely related to a decrease in Western National Bank's net loan assets.

Western National had significant problems with bad loans during the early and middle 1980's. At the start of 1985, Western National Bank had $88,000 in its loan loss reserve. In 1985, it had net loan losses of $462,000, which caused it to have a net loss for 1985. It normally takes at least several years for a bank to correct problems with bad loans.

11. Book Values and Dividend Payment Histories of Scottsbluff National Corp. and Western National Bank

The book values of Scottsbluff National Corp. and Western National Bank on September 30, 1986, and March 31, 1987, were as follows:

| Corporation | 9/30/86 Book Value | 9/30/86 Book Value Per Share | 3/31/87 Book Value | 3/31/87 Book Value Per Share |
|---|---|---|---|---|
| Scottsbluff Natl. Corp. | $14,595,077.21 | $364.88 | $15,719,232.71 | $392.98 |
| Western Natl. Bank | 2,231,862.00 | 111.59 | 2,331,145.79 | 116.56 |

From 1981 to 1986, Scottsbluff National Corp. paid dividends per share as follows:

| Year | Dividends Per Share |
|---|---|
| 1981 | $4.00 |
| 1982 | 4.00 |
| 1983 | 4.00 |
| 1984 | 11.00 |
| 1985 | 10.50 |
| 1986 | 12.50 |

Western National Bank paid no dividends in 1985 and dividends of 80 cents per share in 1986.

12.  Petitioner's Gifts of Shares in Kosman, Inc.

Before September 30, 1986, petitioner owned 2,340 shares (46.8 percent) of the voting common stock of Kosman, Inc.; 2,340 shares (46.8 percent) of the nonvoting common stock of Kosman, Inc.; and 5,616 shares (46.8 percent) of the voting preferred stock of Kosman, Inc.  On September 30, 1986, and March 31, 1987, petitioner gave the following shares of Kosman, Inc., stock to her children:

| Donee | Date Of Gift | Voting Common Shares | Nonvoting Common Shares |
|-------|---------|----------------|-------------------|
| H.H. Kosman | 9/30/86 | 1,703.41 | -- |
| Dianna Kosman | 9/30/86 | -- | 1,281.54 |
| Ann Burkholder | 9/30/86 | 223.08 | 1,058.46 |
| | 3/31/87 | 348.41 | -- |

Those gifts are the subject of this case.  Petitioner also gave 94.77 and 530 shares of Kosman, Inc., voting preferred stock to Ann Burkholder and Diana Kosman, respectively, on March 31, 1987.  The value of that stock is not in dispute.  From July 21, 1986, to the end of 1987, petitioner did not own a majority of the outstanding voting shares of Kosman, Inc.

Petitioner and the other shareholders of Kosman, Inc., owned the following shares of Kosman, Inc., stock on the dates shown:

From July 21, 1986, to September 30, 1986--

| Shareholder | Voting Common Shares | % | Nonvoting Common Shares | % | Voting Preferred Shares | % |
|---|---|---|---|---|---|---|
| Petitioner | 2,340.00 | 46.80 | 2,340.00 | 46.80 | 5,616.00 | 46.80 |
| H.H. Kosman | 197.50 | 3.95 | 197.50 | 3.95 | 474.00 | 3.95 |
| Diana Kosman | 181.00 | 3.62 | 181.00 | 3.62 | 434.40 | 3.62 |
| Ann Burkholder | 361.50 | 7.23 | 361.50 | 7.23 | 867.60 | 7.23 |
| H.D. Kosman Trust | 1,920.00 | 38.40 | 1,920.00 | 38.40 | 4,608.00 | 38.40 |

From October 1, 1986, to March 31, 1987--

| Shareholder | Voting Common Shares | % | Nonvoting Common Shares | % | Voting Preferred Shares | % |
|---|---|---|---|---|---|---|
| Petitioner | 413.51 | 8.27 | -- | 0.00 | 5,616.00 | 46.80 |
| H.H. Kosman | 1,900.00 | 38.02 | 197.50 | 3.95 | 474.00 | 3.95 |
| Diana Kosman | 181.00 | 3.62 | 1,462.54 | 29.25 | 434.40 | 3.62 |
| Ann Burkholder | 584.58 | 11.69 | 1,419.96 | 28.40 | 867.60 | 7.23 |
| H.D. Kosman Trust | 1,920.00 | 38.40 | 1,920.00 | 38.40 | 4,608.00 | 38.40 |

After March 31, 1987--

| Shareholder | Voting Common Shares | % | Nonvoting Common Shares | % | Voting Preferred Shares | % |
|---|---|---|---|---|---|---|
| Petitioner | 65.10 | 1.30 | -- | 0.00 | 4,991.23 | 41.59 |
| H.H. Kosman | 1,900.91 | 38.02 | 197.50 | 3.95 | 474.00 | 3.95 |
| Diana Kosman | 181.00 | 3.62 | 1,462.54 | 29.25 | 964.40 | 8.04 |
| Ann Burkholder | 932.99 | 18.66 | 1,419.96 | 28.40 | 962.37 | 8.02 |
| H.D. Kosman Trust | 1,920.00 | 38.40 | 1,920.00 | 38.40 | 4,608.00 | 38.40 |

13. Gift Tax Returns, Notice of Deficiency, and Respondent's Amended Answer

On her 1986 and 1987 gift tax returns, petitioner reported that the fair market value of Kosman, Inc., stock was $125.63 per share on September 30, 1986, and $153.62 per share on March 31, 1987.

In preparing her 1986 and 1987 returns, petitioner retained the certified public accounting firm of Grant Thornton to appraise the shares. Petitioner reported the values that Grant Thornton placed on them.

In the notice of deficiency, respondent determined that the fair market value of voting and nonvoting Kosman, Inc., stock was $223.60 per share on September 30, 1986, and $240.68 per share on March 31, 1987. In an amended answer, respondent alleged that the fair market value per share of the voting and nonvoting common stock of Kosman, Inc., on September 30, 1986, and March 31, 1987, was $294 for voting shares and $282 for nonvoting shares.

Respondent's position in the amended answer results in a larger gift tax deficiency than respondent determined in the notice of deficiency.

14. Purchases of Scottsbluff National Corp. Stock From Former Employees and Others

There were a few sales of shares of Scottsbluff National Corp. stock from 1984 to 1988 involving directors and longtime employees. These were sales of minority interests.

Several stock purchase agreements were made with directors and employees of Scottsbluff National Bank before 1986. One of the agreements, made many years before 1986, set a sales price for Scottsbluff National Bank stock equal to 90 percent of the shares' book value. Two other agreements set a sales price equal

to the shares' unadjusted book value.  Several of these stock purchase agreements set a sales price equal to 1.15 times the shares' unadjusted book value.

In 1984, petitioner bought 500 shares of Scottsbluff National Corp. stock from the estate of Ruth Witters for a price equal to 1.15 times the shares' book value.  Ruth Witters was the widow of a former longtime employee and vice president of Scottsbluff National Bank.

On April 11, 1988, Kosman, Inc., bought 100 shares of Scottsbluff National Corp. stock from Robert Berggen for $430.85 per share.  The price approximately equaled the book value per share.  Robert Berggen had been a director of Scottsbluff National Corp.  He agreed to sell the shares when he left the board of the corporation.

On November 23, 1988, the Estate of Lawrence Baltas sold a total of 100 shares of Scottsbluff National Corp. stock to 10 different parties, including Kosman, Inc., for $543 per share. On that date, Kosman, Inc., bought 10 shares from the estate for $543 per share.  The price exceeded the book value per share. Lawrence Baltas had been a shareholder of Western National Bank. He acquired his Scottsbluff National Corp. shares when Western National Bank and Scottsbluff National Bank merged in 1987.  He left his estate to two charitable foundations in Scottsbluff.

On December 23, 1988, Kosman, Inc., bought 1,140 shares of Scottsbluff National Corp. stock from Helen Schwab for $456.29

per share. The price exceeded the shares' book value. The shares were sold under purchase agreements made from 1967 to 1975. Helen Schwab was the widow of a former director of Scottsbluff National Bank. Shortly after Kosman, Inc., bought these shares of stock, it resold 400 of them to Ann Burkholder's family for $465 per share. Ann Burkholder is the sister of H.H. Kosman. Kosman, Inc., sold the 400 shares to the Burkholder family because it did not have enough cash to pay for the 1,140 shares it was buying from Helen Schwab.

15. First Commerce Bancshares, Inc.

The following findings of fact relate to First Commerce Bancshares, Inc. (First Commerce), a publicly traded Nebraska bank both parties considered as comparable to Scottsbluff National Bank and Western National Bank.

First Commerce is a bank holding company that operates banks throughout Nebraska. In 1985 and 1986, its banking operations were unprofitable. However, it had a net profit for 1985 and 1986 in part because it terminated an employee pension plan and it had securities gains.

First Commerce was formed in 1985 by consolidating six bank holding companies, each of which owned one bank. One family owned a majority of the stock of each of the holding companies. The transactions under which the six bank holding companies were consolidated into First Commerce were not at arm's-length.

Before the consolidation, several of the bank holding companies had operating agreements with the Comptroller of the Currency. These agreements generally required the bank to correct problem loans, to maintain a prescribed minimum level of capital, and to pay dividends only according to sound banking practice. After the consolidation, five of the six banks owned by National Commerce Bancshares, Inc., paid no dividends.

OPINION

1. Background

Section 2501 imposes a tax on gifts of property by an individual. Gift tax is based on the fair market value of the property on the date of the gift. Sec. 2512(a). Fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of the relevant facts. United States v. Cartwright, 411 U.S. 546, 551 (1973); sec. 25.2512-1, Gift Tax Regs.

If the stock does not sell for its fair market value, then reasonable modifications of that price are made to decide its fair market value. See sec. 20.2031-2(e), Estate Tax Regs. If selling prices for stock are unavailable, then we decide its fair market value by considering factors such as the company's net worth, earning power, dividend-paying capacity, management, goodwill, position in the industry, the economic outlook in its industry, and the values of publicly traded stock of comparable

corporations.  See sec. 20.2031-2(f), Estate Tax Regs.  The fair market value of stock is a question of fact.  Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), affg. T.C. Memo. 1961-347.

Each party called expert witnesses to testify at trial. They each valued petitioner's Kosman, Inc., stock by valuing the Scottsbluff National Corp. stock and Western National Bank stock that Kosman, Inc., owned.  We are not bound by the opinion of any expert witness, and we may accept or reject expert testimony exercising our sound judgment.  Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938); Fitts' Estate v. Commissioner, 237 F.2d 729, 732-733 (8th Cir. 1956), affg. T.C. Memo. 1955-269; IT&S of Iowa, Inc. v. Commissioner, 97 T.C. 496, 508 (1991).

Petitioner has the burden of proving that respondent's determinations in the notice of deficiency are erroneous.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Respondent has the burden of proving the increased deficiency asserted in the amended answer.  Rule 142(b).

2.  Value of Kosman Inc.'s Scottsbluff National Corp. Stock

Petitioner's expert and respondent's experts concluded that the value of Kosman, Inc.'s Scottsbluff National Corp. stock was as follows:

| Expert | Valuation Date | Value Of Scottsbluff Natl. Corp. Stock |
|---|---|---|
| Petitioner's | 9/30/86 | $2,810,133 |
| Expert | 3/31/87 | 2,991,447 |
| Respondent's | 9/30/86 | 4,633,555 |
| Experts | 3/31/87 | 4,633,555 |

a.   Petitioner's Expert's Estimate of the Value of Kosman,
     Inc.'s Scottsbluff National Corp. Stock

Petitioner's expert compared Scottsbluff National Bank to Nebraska's nine other largest banks.  He noted that, of those banks, only First National Bank of Columbus (the sixth largest), Scottsbluff National Bank (the seventh largest), and Delay National Bank of Norfolk (the eighth largest) were not located in Omaha or Lincoln, Nebraska.

Petitioner's expert concluded that Scottsbluff National Bank had strengths and weaknesses compared to Nebraska's nine other banks.  He noted that Scottsbluff National Bank consistently produced substantial profits and that it had an acceptable amount of overhead expense.  He stated that the primary weaknesses of Scottsbluff National Bank were that much of its loan portfolio was in agricultural loans and that the percentage of its nonperforming loans was higher than six of the nine other largest Nebraska banks.

Petitioner's expert considered as possible comparables four publicly traded bank holding companies that owned one or more of the 10 largest Nebraska banks.  These four companies were: Norwest Corp., which owned Norwest Bank in Omaha (Nebraska's largest bank); FirsTier Financial, which owned FirsTier Bank in Omaha (the second largest bank) and FirsTier Bank in Lincoln (the third largest bank); First National of Nebraska, which owned First National Bank of Omaha (the fourth largest bank); and First

Commerce Bankshares, Inc. (First Commerce), which owned National Bank of Commerce in Lincoln (the fifth largest bank).

Petitioner's expert rejected using Norwest Corp. as a comparable because it was large and owned several other banks in the upper Midwest. He rejected using FirsTier Financial as a comparable because it owned two large and well established Lincoln and Omaha banks. He rejected using First National of Nebraska as a comparable because it had a large credit card business.

Petitioner's expert believed that First Commerce was the most comparable to Scottsbluff National Corp. because First Commerce had substantial banking interests outside of Lincoln and Omaha. National Bank of Commerce in Lincoln represented 53 percent of First Commerce's total assets. First Commerce also owned banks in Grand Island, Hastings, Kearney, North Platte, and West Point, Nebraska, and owned industrial loan companies in Columbus, Lincoln, and Scottsbluff. First Commerce stock traded for $13.25 per share on September 30, 1986, and March 31, 1987, which petitioner's expert estimated was 57.7 percent of its book value per share of $22.97 on December 31, 1986.

Petitioner's expert concluded that Scottsbluff National Corp. was in better financial condition than First Commerce, and that its stock would trade at 60 percent of its book value per share on September 30, 1986, and March 31, 1987. Petitioner's

expert concluded that the value of Kosman, Inc.'s Scottsbluff National Corp. stock was as follows:

| Date | Total Value | Value Per Share |
|------|-------------|-----------------|
| 9/30/86 | $2,810,133 | $218.96 |
| 3/31/87 | 2,991,447 | 233.09 |

    b.    <u>Respondent's Experts' Estimate of the Value of Kosman, Inc.'s Scottsbluff National Corp. Stock</u>

Respondent relied on expert reports coauthored by three experts. They used: (1) An income method, based on Scottsbluff National Corp.'s projected after tax earnings over a 5-year period; and (2) a market method, based on the price of stock in comparable banks. To apply the income method, respondent's experts estimated the present value of Scottsbluff National Bank's projected after-tax earnings for 5 years. They used a 14-percent discount rate on the assumption that an investment in Scottsbluff National Bank was comparable to one in "Standard & Poor's 500 small capitalized companies". Respondent's experts concluded that a 100-percent stock interest in Scottsbluff National Corp. was worth $19.2 million on September 30, 1986, and March 31, 1987.

To apply the market method, respondent's experts used as comparables First Commerce and First National Bank of Nebraska. They estimated that First Commerce stock traded at 54 percent of its book value per share on December 31, 1986. They noted that Scottsbluff National Corp. was more profitable and paid higher

dividends per share than First Commerce, and had no long-term debt. Respondent's experts said that investors would value Scottsbluff National Corp. at a higher multiple of earnings and percentage of book value per share than First Commerce.

Respondent's experts estimated that shares of First National of Nebraska stock traded at 86 percent of its book value per share on December 31, 1986. They noted that First National of Nebraska was larger, more diversified, more profitable, and had better income growth than Scottsbluff National Corp. They said that the market would value Scottsbluff National Corp. at a lower percentage of book value per share than First National of Nebraska. Despite that conclusion, respondent's experts estimated, using the market method, that Scottsbluff National Corp. stock would sell at 125 percent of book value per share. They did not explain this inconsistency. Using a market method, they concluded that a 100-percent stock interest in Scottsbluff National was worth $18.8 million on September 30, 1986, and March 31, 1987.

As discussed above, respondent's experts valued a stock interest in Scottsbluff National Corp. at $19.2 million under an income method. They concluded that the fair market value of a 100-percent stock interest in Scottsbluff National Corp. was $19 million on September 30, 1986, and March 31, 1987.

Respondent's experts applied a 15-percent minority interest discount and a 10-percent discount for lack of marketability in

valuing Kosman, Inc.'s Scottsbluff National Corp. stock. Respondent's experts concluded that the fair market value of Kosman, Inc.'s 32.085 percent stock interest in Scottsbluff National Corp. was $4,663,555 on September 30, 1986, and March 31, 1987.

   c.   Analysis:  Value of Kosman, Inc.'s Scottsbluff National
        Corp. Stock

Petitioner's expert acknowledged that Scottsbluff National Corp. was in better financial condition than First Commerce, the company he considered to be most comparable.  Petitioner's expert estimated that First Commerce stock sold at 57.7 percent of its book value per share on September 30, 1986, and March 31, 1987. Petitioner's expert concluded that shares of Scottsbluff National Corp. stock would sell at 60 percent of book value per share.  We believe that 60 percent is too low, considering Scottsbluff National Corp.'s better financial condition.

Petitioner's expert said that by September 30, 1986, the investing public thought the northwestern Nebraska economy might improve soon.  Petitioner's expert noted that from mid-1985 to September 30, 1986, the price of First Commerce stock increased 76 percent from $7.50 per share to $13.25 per share.

Respondent's experts used as comparables four non-Nebraska bank holding companies, including Mark Twain Bancshares in St. Louis, Missouri.  Respondent's experts did not adequately

address whether economic conditions in those bank markets and in northwestern Nebraska were similar.

Respondent's experts chose as one of their comparables First National of Nebraska, the stock they estimated traded at 86 percent of its book value per share on September 30, 1986, and March 31, 1987. They said that Scottsbluff National Corp.'s stock was worth less than 86 percent of its book value per share, yet they valued Scottsbluff National Corp. stock at 125 percent of its book value per share under the market method.

To apply the income method, respondent's experts used a 14-percent discount rate because that rate is used to value a Standard & Poor's 500 small capitalized company. We do not believe that a 14-percent discount rate recognizes the economic outlook for Scottsbluff National Bank.

Respondent argues that Scottsbluff National Corp. stock sold at 100 to 115 percent of its book value per share from 1984 to 1988. With one exception, the sales on which respondent relies involved former employees, directors, or their families. The shareholders received higher prices for their shares because of their association with the corporation.

We conclude that the fair market value of Kosman, Inc.'s Scottsbluff National Corp. stock was 70 percent of its book value per share. This figure is between the 86 percent used by respondent's experts and the 60 percent used by petitioner's expert. We hold that the fair market value of Kosman, Inc.'s

32.085 percent stock interest in Scottsbluff National Corp. was $3,278,009 on September 30, 1986, and $3,530,454 on March 30, 1987.

3. Value of Kosman, Inc.'s Western National Bank Stock

Petitioner's expert and respondent's experts concluded that the value of Kosman, Inc.'s 2,000 shares of Western National Bank stock was as follows:

| Expert | Valuation Date | Value Per Share | Value Of Western National Bank Stock |
|---|---|---|---|
| Petitioner's expert | 9/30/86 | $46.00 | $92,000 |
|  | 3/31/87 | 70.63 | 141,260 |
| Respondent's experts | 9/30/86 | 76.50 | 153,000 |
|  | 3/31/87 | 76.50 | 153,000 |

a. Petitioner's Expert's Estimate of the Value of Kosman, Inc.'s Western National Bank Stock

Petitioner's expert used two different methods to estimate the value of Kosman, Inc.'s Western National Bank stock for each valuation date. For September 30, 1986, petitioner's expert said that Lincoln Bank South in Lincoln, Nebraska, was comparable to Western National Bank. However, petitioner's expert said that a prospective buyer would substantially discount Western National Bank's stock because Western National Bank had a high percentage of nonperforming loans and Lincoln, Nebraska, had better economic conditions.

On September 30, 1986, Lincoln Bank South's stock was publicly traded at $3 per share, which was 61.2 percent of its book value per share. Petitioner's expert concluded that Western National Bank stock should be discounted substantially. Petitioner's expert calculated the amount of the discount by using a letter written by Professor O. Maurice Joy of the University of Kansas which was attached to petitioner's expert's report. Respondent retained Professor Joy to value the stock of Western National Bank and Scottsbluff National Corp. as of September 30, 1986, and March 31, 1987. Professor Joy estimated that the stock of Western National Bank had a fair market value of $46 per share on September 30, 1986. Petitioner's expert relied on that amount.

Scottsbluff National Corp. and Western National Bank agreed to merge on March 4, 1987. Western National Bank's shareholders received one share of Scottsbluff National Corp. stock for 3.3 shares of Western National Bank's stock. Petitioner's expert assumed that 3.3 shares of Western National Bank equaled the value of one share of Scottsbluff National Bank which petitioner's expert estimated to be $233.09 per share. He concluded that the fair market value of Western National Bank shares on March 31, 1987, was $70.63 per share and the fair market value of Kosman, Inc.'s holdings of Western National Bank was $141,260.

b.    Respondent's Experts' Estimate of the Value of Kosman, Inc.'s Western National Bank Stock

Respondent's experts used two income methods and a market method to value Kosman Inc.'s Western National Bank stock based on the value of the bank's projected income.  The income methods they used are a discounted cash-flow method and a capitalization of earnings method.

Using the income methods, respondent's experts estimated the present value of Western National Bank's projected after tax earnings over 5 years.  They used a discount rate of 15 percent.  They believed an investment in Western National Bank was comparable to an investment in "Standard & Poor's 500 small capitalized companies".  Under the income methods respondent's experts concluded that a 100-percent stock interest in Western National Bank was worth $2 million.

Under the market method, respondent's experts chose as comparables six banks, five of which were in agricultural areas.  Each of the six banks was acquired in a private transaction.  Three of the six banks were in Kansas, two were in Nebraska, and one was in North Dakota.  Using a market method, respondent's experts concluded that a 100-percent stock interest in Western National Bank was worth $2.35 million.

As discussed above, respondent's experts concluded that a 100-percent stock interest in Western National Bank was worth $2 million under an income method.  They concluded that the fair

market value of a 100-percent stock interest in Western National Bank was $2.25 million on September 30, 1986, and March 31, 1987.

Respondent's experts applied a minority interest discount of 20 percent and a lack of marketability discount of 15 percent to value Kosman, Inc.'s stock interest in Western National Bank. They concluded that the fair market value of Kosman, Inc.'s 10-percent stock interest in Western National bank was $153,000 on September 30, 1986, and March 31, 1987.

c.    Analysis:  Value of Kosman, Inc.'s Western National Bank Stock

We believe that the approach used by the experts for both parties is reasonable for the March 31, 1987, valuation. However, we believe that respondent's experts overestimated the value of Western National Bank stock. They used two income methods, but placed undue emphasis on the higher capitalization of earnings ($2,010,000) and disregarded the discounted cash-flow method ($1,620,000). We believe their income method estimate should be reduced slightly. None of the banks that they believed were comparable performed like Western National Bank. The average price-to-earnings ratio of the six banks that they selected as comparables was 22.17 to 1. Western National Bank was less profitable than five of the six comparables. They assumed a price-to-earnings ratio of 20 to 1, but did not give their basis for that assumption. We believe their market value method estimate should be reduced slightly. We reduce their

appraised value of Western National Bank by 2 percent. Using the discounts they chose, the fair market value of Kosman Inc.'s 10-percent ownership interest in Western National Bank is about $144,000.

Petitioner's expert assumed that the merger agreement ratio was accurate and that his estimate of the value of Scottsbluff National Corp. stock was correct. We believe that the merger ratio generally reflects fair market value. However, as discussed above, we have found that his estimate of the value of Scottsbluff National Corp. is slightly low. We conclude that the fair market value of Kosman, Inc.'s shares of Western National Bank on March 31, 1987, was $144,000 or $72 per share.

We give petitioner's expert's estimate of value on September 30, 1986, less weight because petitioner's expert used the $46 amount in Professor Joy's letter out of context, without using any of Professor Joy's other conclusions. Professor Joy's letter was a single page of conclusions with no analysis. Petitioner did not use Professor Joy's value of Western National Bank stock on March 31, 1987. We believe petitioner's expert's estimate is too low.

Respondent's experts concluded that there was no significant change in conditions from September 30, 1986, to March 31, 1987, that affected the value of Western National Bank stock. We disagree. In October 1986, the board of directors of Scottsbluff National Corp. approved a plan to acquire Western National Bank

by merger, which is a significant change in conditions. Thus, respondent's experts' estimate is too high. We conclude that the fair market value of Kosman, Inc.'s Western National Bank stock was $120,000 ($60 per share) on September 30, 1986. See <u>Webster Investors, Inc. v. Commissioner</u>, 291 F.2d 192, 194 (2d Cir. 1961), affg. T.C. Memo. 1960-74.

4. <u>Value of Kosman, Inc.'s Voting and Nonvoting Stock Before Discounts</u>

    a.   <u>Value of Kosman, Inc.'s Scottsbluff National Corp. and Western National Bank Stock</u>

Petitioner's and respondent's experts' opinions and our holding as to the value of Kosman, Inc.'s Scottsbluff National Corp. and Western National Bank stock on September 30, 1986, and March 31, 1987, are as follows:

| Valuation Date | Stock | Petitioner's Expert | Respondent's Experts | Holding |
|---|---|---|---|---|
| 9/30/86 | Scottsbluff Natl. Corp. | $2,810,133 | $4,663,555 | $3,278,009 |
| | Western Natl. Bank | 92,000 | 153,000 | 120,000 |
| 3/31/87 | Scottsbluff Natl. Corp. | 2,991,447 | 4,663,555 | 3,530,454 |
| | Western Natl. Bank | 141,260 | 153,000 | 144,000 |

b.  Value Per Share of Kosman, Inc.'s Voting and Nonvoting Common Shares

Before allowing for discounts, the experts' opinions and our holding as to the value per share of Kosman, Inc.'s stock on September 30, 1986, and March 31, 1987, are as follows:

| Valuation Date | Stock | Petitioner's Expert | Respondent's Experts | Holding |
|---|---|---|---|---|
| 9/30/86 | Voting & nonvoting common | $172.21 | $363.22 | $218.80 |
| 3/31/87 | Voting & nonvoting common | 195.20 | 363.22 | 247.17 |

5. <u>Discounts for Stock of Kosman, Inc.</u>

The experts applied the following discounts:

| Discount | Petitioner's Expert | Respondent's Experts |
|---|---|---|
| Voting & <u>nonvoting stock</u> | | |
| Minority interest | 10 percent | 10 percent |
| lack of market- ability | 25 percent | 10 percent |
| <u>Nonvoting stock</u> | | |
| Lack of voting power | 10 percent | 4 percent |

a.  <u>Minority Interest Discount</u>

Both parties' experts applied a 10-percent minority interest discount to value the voting and nonvoting Kosman, Inc., stock that petitioner gave to her children.  We apply a 10-percent minority discount.

b.  <u>Lack of Marketability Discount</u>

Petitioner's expert applied a 25-percent marketability discount to the stock of Kosman, Inc.  He cited a 1971 Securities and Exchange Commission (SEC) study of sales of restricted stock by over-the-counter publicly owned companies in which the stock was discounted for lack of marketability by 30 to 40 percent.  He said that the SEC study suggested use of a significant discount here.

Petitioner's expert also cited a 1994 Wall Street Journal article which applied a discount for lack of marketability because of a SEC regulation that requires foreign investors to hold shares they buy from public companies for 40 days before they can sell the shares in the United States if they do not register or disclose the sale. However, petitioner did not show that the corporations in the article were comparable to Western National Bank or that a 40-day restriction applies.

Respondent's experts applied a 10-percent discount for lack of marketability to the stock of Kosman, Inc. They said that the smaller the block of privately held shares, the greater the discount for lack of marketability owing to the minority interest. They said a study by FMV Opinions, Inc. (FMV study), found marketability discounts of companies, such as Scottsbluff National Bank, with earnings of over $1 million ranging from 10 to 20 percent. They interpreted the 10- to 20-percent range in the FMV study to be the total discount for marketability. They believed an additional 10 percent discount for lack of marketability was proper because, when added to the 9-percent discount for marketability they applied for Scottsbluff National Bank, the total (19 percent) discount was at the upper range reported in the FMV study.

Based on the arguments of the parties and the record, we conclude that a 15-percent discount for lack of marketability is appropriate for the stock of Kosman, Inc.

c.   Nonvoting Share Discount

Petitioner's expert applied a discount of 10 percent to the nonvoting common shares.  He cited an example where a buyer received a 38.9-percent discount, but he did not compare that transaction to this case or explain why he chose 10 percent.

Respondent's experts applied a 4-percent discount.  They cited a study published in the April 1983 issue of "Journal of Financial Economics" (JFE) ("The Market Value of Control in Publicly Traded Corporations"), by R.C. Lease, J.. McConnel, and W.H. Mikkleson.  The JFE study evaluated premiums paid for sales of nonvoting shares in publicly traded corporations which had stock with two different voting rights.  The JFE study showed that premiums for superior voting rights usually ranged from 2 to 4 percent.  Respondent's experts said that the JFE study shows that a 2- to 4-percent discount should apply to stock with inferior voting rights in this case, even though Kosman, Inc., stock was not publicly traded.  We apply a discount of 4 percent to value the nonvoting common shares.  E.g., Wallace v. United States, 566 F. Supp. 904, 917 (D. Mass. 1981) (voting shares valued at 5 percent higher premium than nonvoting shares); Estate

of <u>Winkler v. Commissioner</u>, T.C. Memo. 1989-231 (nonvoting shares had less value than voting shares).

    d.   <u>Summary of Discounts</u>

The experts' opinions and our holding as to the discounts to apply in valuing Kosman, Inc., stock that petitioner gave to her children are as follows:

| Discount | Stock | Petitioner's Expert | Respondent's Experts | Holding |
|---|---|---|---|---|
| Minority interest | Voting & nonvoting common | 10 percent | 10 percent | 10 percent |
| Lack of marketab. | Voting & nonvoting common | 25 percent | 10 percent | 15 percent |
| Lack of voting power | Nonvoting common | 10 percent | 4 percent | 4 percent |

6.   <u>Value of Kosman, Inc., Stock That Petitioner Gave to Her Children</u>

We conclude that the fair market value per share of the stock of Kosman, Inc., that petitioner gave to her children was as follows:

| | Voting Stock | Nonvoting Stock |
|---|---|---|
| September 30, 1986 | $164.85 | $156.06 |
| March 31, 1987 | 185.58 | 175.69 |

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.