DARRYL R. DOBIN AND MAVIS M. DOBIN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 12701–78.     Filed March 18, 1980.

*David F. Grams,* for the petitioner.
*Robert R. Rubin,* for the respondent.

OPINION

NIMS, *Judge:* Respondent has determined an income tax deficiency of $2,416.16 for the year 1975. The sole issue for our determination is whether petitioners are entitled to a section 44[1] tax credit for purchasing a new principal residence in the year 1975.

The facts in this case were fully stipulated. The stipulation of facts and attached exhibits are incorporated herein by reference.

Petitioners' legal residence was in the State of Wisconsin at the time the petition was filed in this case.

---

[10]T.C. Memo. 1971–135.

[1]All statutory references are to the Internal Revenue Code of 1954, as in effect during the year in issue, except as otherwise expressly indicated.

In October 1974, petitioners moved from Springfield, Ill., to Madison, Wis., where they rented a house from one Stephen M. Banaszak. Construction of this house had begun on January 7, 1974, and had been completed on August 15, 1974. When petitioners moved into this house on October 21, 1974, they were the first occupants of the house, and they used it as their principal residence.

At the time they moved to Madison, petitioners could not afford to purchase a new house since they had not yet sold their house in Illinois. Petitioners verbally told their landlord that they intended to purchase the house that they leased as soon as they had an acceptable downpayment. The landlord agreed that 20 percent of each lease payment, or $85, would be applied to this purchase. This verbal agreement was reduced to writing by letter dated October 9, 1974, from Darryl Dobin to, and accepted by, Stephen M. Banaszak. The record contains no evidence that petitioners received credit for these 20-percent payments, and it contains inferences which suggest that they did not.

Petitioners purchased the residence by land contract dated April 5, 1975, and effective April 1, 1975, and they continued to occupy it from that time on.

On their return for the year 1975, petitioners took a section 44 credit for the purchase of a new principal residence in the amount of $2,000. In the notice of deficiency, the respondent disallowed the credit for the stated reason that petitioners did not acquire and occupy the residence after March 12, 1975.

---

Section 44 provides in pertinent part:

(a) GENERAL RULE.—In the case of an individual there is allowed, as a credit against the tax imposed by this chapter for the taxable year, an amount equal to 5 percent of the purchase price of a new principal residence purchased or constructed by the taxpayer.

\* \* \* \* \* \* \*

(c) DEFINITIONS.—For purposes of this section—

(1) NEW PRINCIPAL RESIDENCE.—The term "new principal residence" means a principal residence (within the meaning of section 1034), the original use of which commences with the taxpayer, and includes, without being limited to, a single family structure, a residential unit in a condominium or cooperative housing project, and a mobile home.

\* \* \* \* \* \* \*

(e) PROPERTY TO WHICH SECTION APPLIES.—

(1) IN GENERAL.—The provisions of this section apply to a new principal residence—

(A) the construction of which began before March 26, 1975,

(B) which is acquired and occupied by the taxpayer after March 12, 1975, and before January 1, 1977, and

(C) if not constructed by the taxpayer, which was acquired by the taxpayer under a binding contract entered into by the taxpayer before January 1, 1976.

\*　　\*　　\*　　\*　　\*　　\*　　\*

(3) BINDING CONTRACT.—For purposes of this subsection, a contract for the purchase of a residence which is conditioned upon the purchaser's obtaining a loan for the purchase of the residence (including conditions as to the amount or interest rate of such loan) is not considered non-binding on account of that condition.

The quoted provisions establish five requirements:

(1) The residence must be a *principal residence;*

(2) The *original use* of the residence must commence with the taxpayer;

(3) *Construction* of the residence must have begun before March 26, 1975;

(4) The residence must have been *acquired and occupied* by the taxpayer after March 12, 1975, and before January 1, 1977; and

(5) The property must have been acquired by the taxpayer under a *binding contract* entered into by the taxpayer before January 1, 1976.

There is no dispute that petitioners meet at least three of the five requirements: the residence was a principal residence; construction began prior to March 26, 1975; and the binding contract was entered into before January 1, 1976. At issue are the second and fourth requirements.

Resolution of the dispute turns on the meaning of the phrases "original use" and "acquired and occupied." Petitioners contend that they meet the literal requisites of the former provision because they were the first ones to live in the house. They take the same position with regard to the second provision, arguing that they "acquired" the property after March 12, 1975, since they purchased it after that date, and that they "occupied" the property after March 12, 1975, since they lived there after that date. Under this construction of the statute, petitioners would view their occupancy of the property before March 12, 1975, as not relevant to the "acquired and occupied" mandate.

Respondent reads the statute differently. Respondent takes the position that the credit is unavailable if the property was occupied by anyone including the eventual owners before the critical March 12, 1975, date. The only exceptions to this occupancy ban that would be countenanced by respondent are two exceptions set forth in the regulations and discussed *infra.*

We agree with petitioners. Since no one lived in the house before petitioners (albeit as tenants and not as owners), its original use began with them. The statute in no way modifies or otherwise defines the term "original use," and we are therefore content to apply its plain meaning. Likewise, the petitioners acquired and occupied the property as their principal residence after March 12, 1975. To hold otherwise would require us to read into the statute words such as "for the first time" after "occupied," and this we are not prepared to do.[2] The key word in this conjunctive test is "acquired," for although it might have been possible to have occupied the property both before as well as after the critical date, the same cannot be said for the act of acquisition. It would have been possible for petitioners to have acquired the property before, on, or after March 12, 1975, but not all three.

Furthermore, petitioners' construction finds support in the legislative history and is the only construction that can be reconciled with the regulations under section 44. Respondent's construction of the statute is correct only if the regulations extend beyond the statute.

Section 44 was a product of the Tax Reduction Act of 1975, Pub. L. 94–12, 89 Stat. 26, signed into law by the President on March 29, 1975. The Tax Reduction Act was somewhat atypical insofar as tax legislation goes. It was not intended as a corrective measure, but as an economic aid to our ailing economy.[3] To this end, the act was structured to do just what its title suggests—reduce taxes.

---

[2]Indeed, the version of the law that passed the Senate contained a provision intended to be new sec. 44(e)(2) which provided as follows:

NEW CONSTRUCTION LIMITATION.—For purposes of this section, the term 'new principal residence' means only property not occupied before March 13, 1975, by the taxpayer or any other person as his principal residence * * * [H.R. 2166, 94th Cong., 1st Sess. (1975).]

Had this provision been contained in the final version as codified, petitioners of course would lose. However, this provision was dropped in conference suggesting that the opposite result should obtain in certain circumstances.

[3]H. Rept. 94–19 (1975), 1975–1 C.B. 569, 570–572, S. Rept. 94–36 (1975), 1975–1 C.B. 590.

The House-passed version of the bill (H.R. 2166), contained no provision parallel to section 44. Early in the hearings before the Senate Finance Committee, Chairman Long evinced a concern for the economic plight of the housing industry and suggested providing home purchasers with a tax credit as a means of stimulation.[4] This thought was picked up by other Senators and witnesses during the course of the hearings,[5] and it eventually found its way into the Senate bill as reported out of committee.

The Senate version of section 44 was broader in scope than the final codification. A credit was allowed for the purchase of all principal residences, whether new or used, between March 13, 1975, and December 31, 1975.[6]

The housing credit provision of the Tax Reduction Act was controversial from its inception. Senator Long sought to quell the unrest at the beginning of the Senate floor debates by indicating to his collegues that he would recommend that the bill be amended to provide the tax credit only for the purchase of new homes, thus reducing the anticipated cost of the measure from $3 billion to $1 billion. 121 Cong. Rec. S4223 (daily ed. Mar. 18, 1975). This change was subsequently made (121 Cong. Rec., *supra* at S4483–S4490), and the amended version was passed by the Senate. Senator Long explained that this proposal would help "move out and sell those 400,000 houses that are in inventory." 121 Cong. Rec. S4791 (daily ed. Mar. 22, 1975).

In conference, the housing credit was limited even further—to the purchase of residences "the construction of which began before March 26, 1975." In other words, the measure was narrowly aimed at the existing inventory of new but unsold homes. Congressman Ullman, speaking before the House of Representatives, stated that the Senate version of the tax credit was an inefficient and wasteful means of stimulating home building (121 Cong. Rec. H2382 (daily ed. Mar. 26, 1975)), but, he noted, the conference measure would facilitate a quick liquida-

---

[4]Anti-Recession Tax Cut: Hearings on H.R. 2166 Before the Senate Comm. on Finance, 94th Cong., 1st Sess. 56–57 (1975).

[5]Hearings on H.R. 2166 Before the Senate Comm. on Finance, *supra* at 81–82, 176–177, 347–348, 412–413, 419, 429, 440–442, 469–472, 492–493.

[6]The Senate committee report stated that the housing industry had suffered disproportionately from the current economic downturn. The report also indicated that although a general tax cut was designed to stimulate the economy as a whole, the committee felt that the housing industry needed its own direct economic stimulus. The housing purchase credit was aimed at that goal. S. Rept. 94–36, *supra*, 1975–1 C.B. at 605.

tion of the existing inventory of homes, a necessary predicate to revitalizing the home building industry. 121 Cong. Rec., *supra* at H2382, H2383, H2398. There was extended discussion of the Conference report on the House floor, 121 Cong. Rec., *supra* at H2382–H2384, H2386–H2389, H2397–H2400, and the bill as recommended by the Conference Committee passed both the House and Senate.

Thus, what began as a broad-sweeping and perhaps inefficient remedial measure became, through the course of the legislative process, a precise response to a specific problem. Congress focused section 44 on the bulging inventory of already built, unsold homes as an attack on the doldrums in the housing industry. Section 44 was designed to stimulate and accelerate the sale of these homes.

In light of this legislative background, it seems clear that the residence in the instant case fits squarely within the class of newly built houses whose sale Congress sought to facilitate by enacting section 44. When the law was enacted, petitioners' residence was part of the existing inventory of new homes that presumably had been built to be sold but which by March 12, 1975, had not yet been sold. It seems likely that petitioners' seller was in a difficult situation as to the house in question, as evidenced by the fact that he was willing to let petitioners occupy the property—a new house—prior to taking title to same. This is not the stuff of a seller's market. In this context, renting the property did not take it out of the class of property the sale of which Congress sought to impel by enacting section 44.

Respondent relies on the regulations to buttress his argument. The regulations reject a per se imprimatur for occupancy prior to March 12, 1975, and take a measured approach to that situation. Section 1.44–2(b), Income Tax Regs., which sets forth the "acquisition and occupancy" rules,[7] and section 1.44–5(a), Income Tax Regs., which defines "original use,"[8] recognize that

---

[7]Sec. 1.44–2(b), Income Tax Regs., provides in pertinent part:

"Where a taxpayer occupied a residence prior to March 13, 1975 without having acquired it (as where his occupancy was pursuant to a leasing arrangement pending settlement under a binding contract to purchase or pursuant to a leasing arrangement where a written option to purchase was contained in the original lease agreement) he will nonetheless satisfy the acquisition and occupancy tests set forth above if he acquires the residence and continues to occupy it after March 12, 1975, and before January 1, 1977."

[8]Sec. 1.44–5(a), Income Tax Regs., provides in pertinent part:

houses occupied before March 12, 1975, by the eventual owner-occupant can qualify for the tax credit in at least two circumstances: where the occupancy was pursuant to a lease arrangement pending settlement of a binding contract to purchase; and where the occupancy was pursuant to a lease arrangement containing a written option to purchase.

On brief, respondent pays homage to these regulations but contends that the regulations delineate the only two exceptions to the general rule that the property cannot have been occupied prior to March 12, 1975. If respondent is correct in that regard, the unstated corollary to his argument would be that the two regulation examples fall outside the scope of section 44. We are unwilling to accord that type of construction to section 44.

Moreover, with all due respect to respondent, we read the regulations differently. The critical language, which is contained in notes 7 and 8, does not purport to set down hard and fast rules for determining when a taxpayer's occupancy of a residence before acquisition will prove fatal to his or her case. The scope of the regulations is much more modest. The regulations simply provide by way of example two situations where such occupancy will be countenanced. What other situations are equally as propitious and whether this case reflects one of those is not explicitly resolved by the regulations.[9]

There is some merit in the suggestion contained in the examples that not every original user-lessee in the posture of petitioners earns a tax credit merely by purchasing his or her previously leased residence in a timely fashion. Had this house been one that petitioners had occupied for a number of years prior to acquisition, or had petitioners simply leased this house and then later decided to purchase it, the facts would not have dovetailed so nicely into the legislative history. A persuasive argument can be made that Congress did not intend section 44 to reach the situation where the taxpayers had occupied the

---

" 'Original use' of the new principal residence by the taxpayer means that such residence has never been used as a residence prior to its use as such by the taxpayer. For this purpose, a residence will qualify if the first occupancy was by the taxpayer pursuant to a lease arrangement pending settlement under a binding contract to purchase or pursuant to a lease arrangement where a written option to purchase the then existing residence was contained in the original lease agreement."

[9]Respondent cites the Notice of Proposed Rule Making, 40 Fed. Reg. 29874 (July 16, 1975), to support the proposition that the two stated exceptions are the only exceptions allowing occupancy prior to acquisition. Suffice it to say that we never have understood the preamble to proposed regulations to be precedential.

residence for a number of years prior to acquisition. Such a house would not fall into the category of newly built homes.

The second situation may be equally unavailing for taxpayers. The act of renting the house to someone who expresses no intention of purchasing it arguably takes the house out of the troublesome inventory of newly built unsold homes and places it in the category of rental property. The regulation examples appear to speak to that situation by apparently requiring that taxpayers such as petitioners have made some expression of an intent to purchase at the time they occupy the property in order to qualify for the tax credit.

In the instant case, petitioners meet this requirement through their written expression prior to occupancy of an intent to purchase the property. This is strong evidence that the act of renting the property was a temporary expedient rather than a purposive decision on the part of the seller to remove the property from the inventory of newly built and unsold property. As a matter of fact, the intent of Congress is better served by allowing the credit in this type of case than in at least one of the regulation examples. At least here, the tax credit impels taxpayers such as petitioners to purchase the residence. Had the petitioners already been under a binding contract to purchase, as in the regulation example, the tax credit would have been of no incentive.

Our conclusion that the facts of the instant case meet any requirements imposed by the regulations permits us to leave to another day the question of whether the regulations are a valid construction of the statute to the extent that they impose restrictions on pre-March 12, 1975, occupancy by the eventual purchaser.

As a final matter we observe that, while the critical time for acquisition was after March 12, 1975, and before January 1, 1977, the applicable regulations were not adopted until December 1, 1975, and were not even proposed until July 15, 1975. If the purpose of the statute was to give the housing industry a quick infusion of money, it would be unreasonable indeed to now penalize taxpayers like petitioners for not holding off their purchase until the regulations came out. There was no possible way, at the time section 44 was adopted, that petitioners could have known what requirements the regulations would ultimately contain. Therefore, under the highly unusual circumstances under which the statute in question was enacted, we would

consider it inappropriate to apply any regulations as restrictively as respondent would now have us do.

In such circumstances, allowing petitioners to take advantage of the section 44 tax credit serves both the statute's literal mandates and the legislature's intended dictates. We, therefore, conclude that petitioners are entitled to the section 44 tax credit.

Due to concessions by petitioners on another issue,

*Decision will be entered under Rule 155.*