118 T.C. No. 1


UNITED STATES TAX COURT


CHARLES C. ALLEN, III AND BARBARA N. ALLEN,
ET AL.,[1] Petitioners v. COMMISSIONER OF
INTERNAL REVENUE, Respondent


Docket Nos. 1287-00, 1288-00,      Filed January 4, 2002.
1289-00, 1290-00,
1291-00, 1292-00,
1293-00, 1618-00.


Ps are the shareholders of F, a subch. S corporation. During its 1994 and 1995 taxable years, F incurred wages that qualified for the targeted jobs credit (TJC) under secs. 38 and 51, I.R.C. F claimed TJCs of $456,264 and $259,434 for the respective years and reported to Ps their proportionate shares of the credits. F reduced its deduction of wages by the

---

[1] Cases of the following petitioners are consolidated herewith: John R. Allen and Estate of Sally F. Allen, docket No. 1288-00; John R. Allen, Jr., and Susan S. Allen, docket No. 1289-00; John R. and Judith M. Allen, docket No. 1290-00; Charles C. Allen, Jr., docket No. 1291-00; Warren L. Allen, docket No. 1292-00; Warren L. Allen, Jr., docket No. 1293-00; and Amantha S. Allen, docket No. 1618-00.

amount of the TJCs, pursuant to sec. 280C(a), I.R.C., and reported to Ps their proportionate shares of its resulting net income (F's resulting net income). Ps computed their regular tax liability by including F's resulting net income in their taxable income. Ps were not subject to the alternative minimum tax but had to compute their alternative minimum taxable income (AMTI) in order to ascertain for purposes of sec. 38(c)(1)(A), I.R.C., the tentative minimum tax ceiling on the amount of the TJCs that could be applied against their regular tax liability. Ps computed their AMTI by deducting their proportionate shares of F's full wage expense (i.e., the wage expense unreduced by the TJC). R determined that Ps' AMTI had to be computed using F's resulting net income and that the tentative minimum tax ceiling limited Ps' application of the TJC against their regular income tax liabilities.

Held: Because sec. 280C(a), I.R.C., requires that a wage deduction be reduced by the amount of the TJC, and pt. VI, subch. A, ch. 1, subtit. A (secs. 55 through 59, I.R.C.) does not allow for an adjustment of that reduction for purposes of the alternative minimum tax regime, the portion of F's wages equal to the TJC is not deductible in calculating Ps' AMTI.

Robert H. Kapp and John S. Stanton, for petitioners.

David R. Ferguson, for respondent.

OPINION

LARO, Judge: This case was submitted to the Court without trial. See Rule 122.[2] Petitioners petitioned the Court to redetermine respondent's determination of the following deficiencies in their Federal income taxes for 1994 and 1995:

---

[2] Rule references are to the Tax Court Rules of Practice and Procedure. Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the subject years.

| Petitioners | 1994 | 1995 |
|---|---|---|
| Charles C. Allen III and Barbara N. Allen | $21,321 | $12,107 |
| Charles C. Allen, Jr. | 21,324 | 12,015 |
| John R. Allen and Estate of Sally F. Allen | 21,395 | - |
| John R. and Judith M. Allen | - | 12,108 |
| John R. Allen, Jr., and Susan S. Allen | 21,394 | 12,107 |
| Warren L. Allen | 6,388 | 1,970 |
| Warren L. Allen, Jr. | 36,197 | 20,582 |
| Amantha S. Allen | 36,197 | 20,582 |

Following concessions in docket Nos. 1291-00 and 1292-00, we must decide whether the wage-expense limitation of section 280C(a) enters into the calculation of alternative minimum taxable income (AMTI). As relevant herein, section 280C(a) limits a taxpayer's wage expense to the amount of the expense that exceeds the amount of a targeted jobs credit (TJC) determined under section 51(a). We hold that section 280C(a) enters into the calculation of a taxpayer's AMTI.

## Background

All facts were stipulated and are so found. The stipulated facts and the exhibits submitted therewith are incorporated herein by this reference. During the subject years, each petitioner,[3] with the exception of Warren L. Allen and Charles C. Allen, Jr., filed a joint Federal income tax return with his wife. Charles C. Allen III was the husband of Barbara N. Allen. John R. Allen was the husband of Sally F. Allen during 1994, and

_____

[3] We hereinafter refer to Charles C. Allen III, Charles C. Allen, Jr., John R. Allen, John R. Allen, Jr., Warren L. Allen, and Warren L. Allen, Jr., as the sole petitioners.

he was the husband of Judith M. Allen during 1995. John R. Allen, Jr., was the husband of Susan S. Allen. Warren L. Allen, Jr., was the husband of Amantha S. Allen. Each petitioner and his wife (with the exception of Sally F. Allen) resided in Delaware when the petitions were filed. Sally F. Allen was deceased at that time, and the executor of her estate was (and is) John R. Allen, Jr.

Allen Family Foods, Inc. (Foods), is an S corporation that was incorporated under Delaware law. Its business is the slaughtering, converting, and processing of chickens into ready-to-cook whole chickens and chicken parts for sale primarily to retailers. It computes its income and expenses using an accrual method of accounting and on the basis of a fiscal year ending on the Saturday nearest April 30. It filed a Form 1120S, U.S. Income Tax Return for an S Corporation, for its fiscal years ended in 1994 and 1995 (its 1994 and 1995 taxable years, respectively).

Petitioners are descendants of Charles C. Allen, the founder of the family poultry business, and they owned all of Foods' outstanding stock during its 1994 and 1995 taxable years. The number of the shares that they each owned and the percentage of their respective ownership interests were as follows:

| Shareholder | No. of Shares | Percent |
|---|---|---|
| Charles C. Allen, Jr. | 50 | 16.67 |
| Charles C. Allen III | 50 | 16.67 |
| Warren L. Allen | 15 | 5.00 |
| Warren L. Allen, Jr. | 85 | 28.33 |
| John R. Allen | 50 | 16.67 |
| John R. Allen, Jr. | 50 | 16.67 |
| Total | 300 | 100.00 (rounded) |

During its 1994 and 1995 taxable years, Foods incurred wages which qualified for the TJC. Foods claimed TJCs of $456,264 and $259,434 on its 1994 and 1995 Federal income tax returns, respectively, and reported to each petitioner on his Schedules K-1, Shareholder's Share of Income, Credits, Deductions, etc., his proportionate shares of those credits. The Schedules K-1 reported the proportionate shares as follows:

| Shareholder | 1994 | 1995 |
|---|---|---|
| Charles C. Allen, Jr. | $76,044 | $43,239 |
| Charles C. Allen, III | 76,044 | 43,239 |
| Warren L. Allen | 22,813 | 12,972 |
| Warren L. Allen, Jr. | 129,275 | 73,506 |
| John R. Allen | 76,044 | 43,239 |
| John R. Allen, Jr. | 76,044 | 43,239 |
| Total | 456,264 | 259,434 |

For Federal income tax purposes, Foods reduced its deduction of wages by the amount of the TJC as required by section 280C(a) and reported to each petitioner on his Schedules K-1 his proportionate share of the resulting net income (Foods' resulting net income). Each petitioner computed his regular income tax liability for 1994 and 1995 by including in his taxable income his proportionate share of Foods' resulting net income.

Petitioners were not subject to alternative minimum tax but were required to compute their AMTI in order to ascertain for purposes of section 38(c)(1)(A) the tentative minimum tax (TMT) ceiling on the amount of a TJC that may be applied against regular tax liability. For purposes of computing his AMTI for 1994 and 1995, each petitioner claimed deductions for his proportionate share of Foods' full wage expense (i.e., the wage expense unreduced by the TJC). Each petitioner calculated this full wage expense by reference to a negative adjustment equal to the TJC shown on his Schedules K-1. Each petitioner reported the same adjustment on his 1994 and 1995 Forms 6251, Alternative Minimum Tax--Individuals, which were attached to his Federal income tax returns for the respective years.

Each petitioner claimed on his personal income tax returns his proportionate share of the TJC and applied the TJC without limitation by his TMT. The deficiencies at hand are the result of the Commissioner's recalculating petitioners' AMTI for purposes of ascertaining the TMT ceiling. In those recalculations, the Commissioner did not allow each petitioner to deduct as wages the portion of the claimed wages that was equal to his proportionate share of Foods' TJCs. Respondent determined as a result of these recalculations that each petitioner's application of the TJCs for regular tax purposes was less than

claimed on his return by virtue of the TMT limitation of section 38(c)(1)(A).

## Discussion

The Internal Revenue Code imposes upon taxpayers an alternative minimum tax (AMT) in addition to all other taxes imposed by subtitle A. See sec. 55(a). The AMT is imposed upon a taxpayer's AMTI, which is an income base broader than the usual base of taxable income applicable to Federal income taxes in general. See H. Conf. Rept. 99-841 (Vol. II), at II-249 (individual AMT), II-263 (corporate AMT) (1986), 1986-3 C.B. (Vol. 4) 250, 264. Congress established AMTI as a broad base of income in order to tax taxpayers more closely on their economic income, intending for all taxpayers to pay their fair share of the overall Federal income tax burden. See S. Rept. 99-313, at 518-519 (1986), 1986-3 C.B. (Vol. 3) 518-519; H. Rept. 99-426, at 305-306 (1985), 1986-3 C.B. (Vol. 2) 305-306. Congress required that corporations be taxed at a single AMT rate and that individuals be taxed under a progressive AMT regime with two rates. The highest AMT rate applicable to a taxpayer is lower than the taxpayer's maximum rate of taxation under the regular tax regime, and a taxpayer must pay AMT when the taxpayer's AMT liability is greater than the taxpayer's regular tax liability.

The instant case focuses on the tax base upon which AMTI is calculated. Specifically, we pass for the first time on the

question of whether the calculation of AMTI includes the wage-expense limitation of section 280C(a). Respondent asserts it does. Respondent focuses primarily on section 280C(a) and argues that a literal reading of that section always precludes a taxpayer from deducting wages to the extent of a TJC. Respondent acknowledges that a taxpayer cannot apply a TJC to reduce the taxpayer's AMT liability but argues that the wage-expense limitation still applies in the calculation of AMTI because no provision of the Code specifically provides otherwise. Petitioners assert that the wage-expense limitation of section 280C(a) does not enter into the calculation of AMTI. Petitioners point to the fact that the TJC is not an allowable credit for purposes of calculating AMT and conclude from this fact that section 280C(a) does not apply in the calculation of AMTI. Petitioners assert that the AMT regime is a tax system that operates "parallel" to the regular tax regime and that the application of each provision of the Code to the AMT regime must be measured solely within the parameters of that regime.[4]

---

[4] We understand the parties' use of the word "parallel" in the context of the AMT and regular tax regimes to mean that the regimes run independently of each other without ever meeting. See Merriam-Webster's Collegiate Dictionary 842 (10th ed. 1999). In other words, according to the parties, a taxpayer must first apply the provisions of the Code to compute regular tax and then "start from scratch" to apply those provisions to compute AMT. In this regard, the parties state, the de novo calculation of AMTI is made without regard to any calculation made for regular tax purposes.

Petitioners assert that the wage-expense limitation is not applicable to the AMTI calculation under a plain reading of section 280C(a) because a TJC is never determined in the AMT regime. Respondent acknowledges that the primary reading of the provisions underlying the AMT regime requires that a taxpayer calculate AMTI by adjusting taxable income in the manner set forth in section 55(b) but invites the Court to adopt the alternative reading advanced by petitioners under which the AMT and regular tax regimes are considered parallel systems in that the computation of AMT starts from scratch without regard to any calculation made for regular tax purposes. Respondent argues that the fact that a TJC is determined for the regular tax regime is enough to subject petitioners to the wage-expense limitation in the calculation of AMTI under the AMT regime given the absence of any statutory provision that provides to the contrary.

We agree with respondent that the wage-expense limitation of section 280C(a) enters into the calculation of AMTI but do so for reasons different than he espouses. Our analysis begins with the relevant statutory text. We interpret that text with reference to the legislative history primarily to learn the purpose of the statute and to resolve any ambiguity in the words contained in the text. Landgraf v. USI Film Prods., 511 U.S. 244 (1994); Commissioner v. Soliman, 506 U.S. 168, 174 (1993); Consumer Prod. Safety Commn. v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980);

United States v. Am. Trucking Associations, Inc., 310 U.S. 534, 543-544 (1940); Venture Funding, Ltd. v. Commissioner, 110 T.C. 236, 241-242 (1998), affd. without published opinion 198 F.3d 248 (6th Cir. 1999); Trans City Life Ins. Co. v. Commissioner, 106 T.C. 274, 299 (1996). We apply the plain meaning of the words prescribed in the text unless we find that a word's plain meaning is "inescapably ambiguous". Venture Funding, Ltd. v. Commissioner, supra at 241-242; see Garcia v. United States, 469 U.S. 70, 76 n.3 (1984); see also Ex parte Collett, 337 U.S. 55 (1949). Where legislative "will has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive." Negonsott v. Samuels, 507 U.S. 99, 104 (1993).

We look first to the text on the TJC. Section 38 allows each petitioner to credit against his tax the amount of a general business credit. In relevant part, section 38 provides:

SEC. 38. GENERAL BUSINESS CREDIT.

(a) Allowance of Credit.--There shall be allowed as a credit against the tax imposed by this chapter for the taxable year an amount equal to the sum of--

(1) the business credit carryforwards carried to such taxable year,

(2) the amount of the current year business credit, plus

(3) the business credit carrybacks carried to such taxable year.

(b) Current Year Business Credit.--For purposes of this subpart, the amount of the current year business

credit is the sum of the following credits determined for the taxable year:

* * * * * * *

(2) the targeted jobs credit determined under section 51(a);

* * * * * * *

(c)  Limitation Based on Amount of Tax.--

(1) In general.--The credit allowed under subsection (a) for any taxable year shall not exceed the excess (if any) of the taxpayer's net income tax over the greater of--

(A) the tentative minimum tax for the taxable year, or

(B) 25 percent of so much of the taxpayer's net regular tax liability as exceeds $25,000.

For purposes of the preceding sentence, the term "net income tax" means the sum of the regular tax liability and the tax imposed by section 55, reduced by the credits allowable under subparts A and B of this part, and the term "net regular tax liability" means the regular tax liability reduced by the sum of the credits allowable under subparts A and B of this part.

For purposes of section 38(b)(2), the TJC generally entitles a taxpayer such as Foods (and, by virtue of the passthrough nature of Foods, each petitioner) to a credit equal to a percentage of the salaries or wages (collectively, wages) which it incurs in employing individuals described in one or more of the targeted groups enumerated in section 51(d)(1).  If the taxpayer cannot use the full amount of a TJC on account of the

limitation set forth in section 38(c), the taxpayer may carry the unused portion either back or forward in accordance with section 39. In the case of an individual taxpayer, the taxpayer may deduct any portion of a TJC that has not been used as of the time that: (1) The carryforward period of section 39(a) expires or (2) the taxpayer dies. See sec. 196.

The right to apply a TJC, however, does not come without limitation. As relevant herein, section 280C(a) provides that "No deduction shall be allowed for that portion of the wages or salaries paid or incurred for the taxable year which is equal to the sum of the credits determined for the taxable year under sections 45A(a), 51(a) and 1396(a)." Thus, under section 280C(a), a taxpayer may not deduct the portion of wages incurred for the taxable year equal to the TJC determined for that year. A taxpayer, however, may forgo the disallowed deduction by electing not to determine a TJC for that year. Sec. 51(j).

Petitioners concede that they are subject to section 280C(a) for purposes of their regular tax liability. They assert, however, that section 280C(a) is inapplicable in the calculation of AMTI. We disagree. We read nothing in section 38, 51, or 280C that would lead us to conclude that section 280C(a) does not

apply in the case of AMTI.  Nor do we read any of the provisions underlying AMT that would lead us to that result.[5]

The heart of AMT is section 55.  That section provides:

SEC. 55.  ALTERNATIVE MINIMUM TAX IMPOSED.

(a) General Rule.--There is hereby imposed (in addition to any other tax imposed by this subtitle) a tax equal to the excess (if any) of--

(1) the tentative minimum tax for the taxable year, over

(2) the regular tax for the taxable year.

(b) Tentative minimum tax.--For purposes of this part--

(1) Amount of Tentative Tax.

(A)  Noncorporate taxpayers.

(i) In general.--In the case of a taxpayer other than a corporation, the tentative minimum tax for the taxable year is the sum of--

(I) 26 percent of so much of the taxable excess as does not exceed $175,000, plus

---

[5] Although respondent concedes that no petitioner is liable for AMT, we must address the AMT provisions in order to compute each petitioner's TMT.  See sec. 38(c) (in the computation of a taxpayer's regular tax liability, the application of the TJC may be limited by the taxpayer's TMT).  The calculation of a taxpayer's TMT is generally a three-step process in which:  (1) The taxpayer's AMTI is reduced by an exemption amount, (2) the reduced amount is multiplied by the AMT rate, and (3) the resulting tax figure is reduced by the alternative minimum foreign tax credit.  Sec. 55(b)(1), (d).

(II) 28 percent of so much of the taxable excess as exceeds $175,000.

The amount determined under the preceding sentence shall be reduced by the alternative minimum tax foreign tax credit for the taxable year.

(ii) Taxable excess.--For purposes of this subsection, the term "taxable excess" means so much of the alternative minimum taxable income for the taxable year as exceeds the exemption amount.

(iii) Married individual filing separate return.--In the case of a married individual filing a separate return, clause (i) shall be applied by substituting "$87,500" for "$175,000" each place it appears.  For purposes of the preceding sentence, marital status shall be determined under section 7703.

(B) Corporations.--In the case of a corporation, the tentative minimum tax for the taxable year is--

(i) 20 percent of so much of the alternative minimum taxable income for the taxable year as exceeds the exemption amount, reduced by

(ii) the alternative minimum tax foreign tax credit for the taxable year.

(2) Alternative minimum taxable income.--The term "alternative minimum taxable income" means the taxable income of the taxpayer for the taxable year--

> (A) determined with the
> adjustments provided in section 56
> and section 58, and
>
> (B) increased by the amount of
> the items of tax preference
> described in section 57.
>
> If a taxpayer is subject to the regular tax,
> such taxpayer shall be subject to the tax
> imposed by this section (and, if the regular
> tax is determined by reference to an amount
> other than taxable income, such amount shall
> be treated as the taxable income of such
> taxpayer for purposes of the preceding
> sentence).

From this text, we understand explicitly that the base of AMTI is "taxable income", and that this base may be affected by the items described in sections 56, 57, and 58. Sec. 55(b)(2). See generally section 59, which, although not specifically mentioned in section 55, provides definitions and special rules that apply in the setting of AMT. As to the meaning of the term "taxable income", Congress has provided unambiguously and with sweeping breadth that "for purposes of this subtitle, the term 'taxable income' means gross income [see sec. 61(a) for the applicable meaning of the term "gross income"[6]] minus the deductions allowed by this chapter (other than the standard

---

[6] Whereas sec. 61(a) provides that the meaning of the term "gross income" as set forth therein does not apply "where otherwise provided in this subtitle", we are unaware of any provision in the subtitle that would make the sec. 61(a) definition inapplicable to sec. 63(a).

deduction)."[7] Sec. 63(a) (emphasis added). We conclude on the basis of our plain reading of the unambiguous text of sections 55 and 63(a) that a computation of AMTI requires that a taxpayer first compute its taxable income and then alter that amount (by way of an adjustment or an increase) to reflect the items described in the remainder of pt. VI, subch. A, ch. 1, subtit. A (part VI).[8] In fact, notwithstanding respondent's invitation to the Court to conclude that AMTI is calculated de novo, and without regard to any calculation made for regular tax purposes, our conclusion is on all fours with the manner in which respondent requires taxpayers to report their calculations of AMTI for Federal income tax purposes. See, e.g., Form 4626,

---

[7] Congress provided the sole exception to this rule in sec. 63(b). See sec. 63(a). Section 63(b) provides:

> (b) Individuals Who Do Not Itemize Their Deductions.--In the case of an individual who does not elect to itemize his deductions for the taxable year, for purposes of this subtitle, the term "taxable income" means adjusted gross income, minus--
>
> (1) the standard deduction, and
>
> (2) the deduction for personal exemptions provided in section 151.

[8] Part VI includes five sections, numbered and titled as follows:

SEC. 55.  Alternative Minimum Tax Imposed;
SEC. 56.  Adjustments in Computing Alternative Minimum Taxable Income;
SEC. 57.  Items of Tax Preference;
SEC. 58.  Denial of Certain Losses; and
SEC. 59.  Other Definitions and Special Rules.

Alternative Minimum Tax--Corporations; Form 6251 (individuals). Because section 280C is a wage-expense limitation that enters into the computation of taxable income for purposes of section 63(a), and section 280C(a) is not referenced in part VI, we conclude naturally that the limitation is reflected in the calculation of AMTI.

Petitioners assert in their brief that the legislative history underlying AMT "makes clear" that the AMT regime is a "separate and independent tax system that operates in parallel with the RT [regular tax] system and requires separate calculations of a taxpayer's" taxable income for regular tax purposes and AMTI. Petitioners conclude that, notwithstanding the fact that section 280C(a) is not referenced in part VI, section 280C(a) is inapplicable in the AMT regime because the TJC is also inapplicable there. Respondent does not disagree with the parallel tax regime rationale advanced by petitioners. Respondent invites the Court to hold that the systems are "parallel" in the sense that a taxpayer who has calculated taxable income must start from scratch in a separate computation of AMTI. Both respondent and petitioners rely extensively upon the Staff of Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1986 (J. Comm. Print 1987) (General Explanation of the 1986 Act), in arguing that the legislative history under

the current AMT regime supports the treatment of that regime as a system that is parallel to the regular tax regime.

Were we to adopt the parties' contention that the regular tax and AMT regimes are parallel systems, we would be inclined to agree with petitioners that the section 280C(a) wage-expense limitation does not enter into the calculation of AMTI. Because a TJC is not determined in the calculation of AMT, the amount of disallowed wages under section 280C(a) would appear to be zero for purposes of the AMT regime. Moreover, even if a credit were determined for that purpose, although it could not be applied, we know of no reason (nor has respondent suggested one) that would prevent petitioners, given the de novo calculation of AMTI that flows from the parallel systems, from electing under section 51(j) to forgo that credit in the AMT regime in order to claim as a deduction Foods' full wage expense. We decline to adopt the parties' parallel system contention, however, because, as discussed herein, the plain and unambiguous text of the statutes (and the related legislative history) disproves that contention.

As to petitioners, they concede that a plain reading of the relevant statutory provisions fails to distinguish between taxable income for regular tax purposes and taxable income for AMT purpose. Petitioners ask the Court to draw such a distinction pointing solely to two sentences from the General Explanation of the 1986 Act, one sentence in the preamble to

section 1.55-1, Income Tax Regs., and the fact that the Commissioner recognized this distinction in a technical advice memorandum (Tech. Adv. Mem. 9722005 (Feb. 5, 1997)) issued as to the facts of this case. The referenced sentences of the General Explanation of the 1986 Act provide:

> Structure of minimum tax as an alternative system.--For most purposes, the tax base for the new alternative minimum tax is determined as though the alternative minimum tax were a separate and independent income tax system. Thus, for example, where a Code provision refers to a "loss" of the taxpayer from an activity, for purposes of the alternative minimum tax the existence of a loss is determined with regard to the items that are includable and deductible for minimum tax, not regular tax, purposes. [General Explanation of the 1986 Act, supra at 438.]

The referenced sentence in the preamble to section 1.55-1, Income Tax Regs., provides (with a citation to the General Explanation of the 1986 Act, supra at 438 n.9): "Congress generally intended that the AMT be treated as a tax system separate from but parallel to the regular tax system". T.D. 8569, 59, 1994-2 C.B. 13. The technical advice memorandum reasons that the regular tax regime operates parallel to the AMT regime. Tech. Adv. Mem. 9722005 (Feb. 5, 1997).

Respondent, in turn, acknowledges that the primary reading of the AMT provisions requires that AMTI be calculated by modifying taxable income by the items described in part VI. In a manner that is openly inconsistent with respondent's plain reading of section 280C(a), however, respondent invites the Court

not to apply the plain meaning of section 55 and to adopt the de novo computation of AMTI advanced by petitioners. Respondent asserts that the Commissioner has "generally" set forth in his rulings the rationale that the AMT regime is "separate from but parallel to" the regular tax regime. Respondent observes that the phrase "separate from but parallel to" does not appear in the explanation section of any of the committee reports underlying the Tax Reform Act of 1986 (1986 Act), Pub. L. 99-514, 100 Stat. 2085, but that it does appear twice in the "present law" sections of the conference report. The conferees used the phrase to explain the pre-1986 treatment of the carryover of AMT net operating losses (NOLs) and AMT foreign tax credits (FTCs). The conferees stated that the present law applicable to individuals applied the AMT provisions on NOLs and FTCs in the following manner:

### Present Law

NOLs are allowed against alternative minimum taxable income. For years after 1982, minimum tax NOLs are reduced by the items of tax preference. Minimum tax NOLs are carried over under a system separate from but parallel to that applying for regular tax purposes. [H. Conf. Rept. 99-841 (Vol. II), at II-262 (1986), 1986-3 C.B. (Vol. 4) 250, 262.]

### Present Law

Foreign tax credits are allowed against the minimum tax, under limits similar to those applying under the regular tax. Credits that cannot be used in the current taxable year because of these limits are carried over under a system separate from but parallel to that applying for regular tax purposes. [H. Conf.

Rept. 99-841, <u>supra</u> at 261, 1986-3 C.B. (Vol. 4) at 261.[9]]

---

[9] But for these citations, respondent's argument on brief includes no citation to the legislative history underlying the Tax Reform Act of 1986 (1986 Act), Pub. L. 99-514, 100 Stat. 2085, enactment of the current AMT regime. Our research has revealed two other times in which the term "separate from but parallel to" appears in that legislative history. The conferees stated that the House bill provided the following rules on the application of the AMT FTCs and the AMT NOLs to corporate taxpayers:

> Under the House bill, foreign tax credits are allowed against the minimum tax, under limits similar to those applying under the regular tax. Credits that cannot be used in the current taxable year because of these limits are carried over under a system separate from but parallel to that applying for regular tax purposes.

> *    *    *    *    *    *    *

> Under the House bill, the net operating loss deduction is allowed against alternative minimum taxable income. For any taxable year beginning after 1985, the minimum tax is reduced by the items of tax preference arising in that year. Minimum tax NOLs are carried over under a system separate from but parallel to that applying for regular tax purposes. [H. Conf. Rept. 99-841 (Vol. II), <u>supra</u> at II-281, II-282 (1986), 1986-3 C.B. (Vol. 4) at 281, 282.]

In addition to these two uses of the word "parallel" and the other two uses referenced by the parties, our research has uncovered only one other time that the word "parallel" appears in the legislative history underlying the 1986 Act's enactment of the current AMT regime. The conferees stated in its discussion of corporate AMT NOLs:

> It is clarified that, in light of the parallel nature of the regular tax and minimum tax systems, any limitations applying for regular tax purposes to the use by a consolidated group of NOLs or current year losses (e.g., section 1503) apply for minimum tax purposes as well. [H. Conf. Rept. 99-841, <u>supra</u> at II-

(continued...)

Respondent also quotes the following language from the
General Explanation of the 1986 Act:

> STRUCTURE OF MINIMUM TAX AS AN ALTERNATIVE
> SYSTEM.--For most purposes, the tax base for the new
> alternative minimum tax is determined as though the
> alternative minimum tax were a separate and independent
> income tax system.  Thus, for example, where a Code
> provision refers to a 'loss' of the taxpayer from an
> activity, for purposes of the alternative minimum tax
> the existence of a loss is determined with regard to
> the items that are includable and deductible for
> [alternative] minimum tax, not regular tax, purposes.
>
> In certain instances, the operation of the
> alternative minimum tax as a separate and independent
> tax system is set forth expressly in the Code.  With
> respect to the passive loss provision, for example,
> section 58 provides expressly that, in applying the
> limitation for minimum tax purposes, all minimum tax
> adjustments to income and expense are made and regular
> tax deductions that are items of tax preference are
> disregarded.
>
> In other instances, however, where no such express
> statement is made, Congress did not intend to imply
> that similar adjustments were not necessary.  Thus, for
> example, for [alternative] minimum tax purposes it was
> intended that section 1211 (limiting capital losses) be
> computed using [alternative] minimum tax basis, that
> section 263A (requiring the capitalization of certain
> depreciation deductions to inventory) apply with regard
> to [alternative] minimum tax depreciation deductions,
> and that section 265 (relating to expenses of earning
> tax-exempt income) apply with regard only to items
> excludable from alternative minimum taxable income.
> [General Explanation of the 1986 Act, supra at 438; fn.
> refs. omitted and alterations made by respondent.]

We do not believe that the "legislative history" referenced
by the parties displaces our plain and unambiguous reading of the

---

[9](...continued)
282, 1986-3 C.B. (Vol. 4) at 282.]

relevant statutory provisions.  To be sure, the parties, but for citations to the conferees' understanding of the law that preceded the 1986 Act, have not even cited the Court one iota of persuasive legislative history in support of their contentions. The General Explanation of the 1986 Act, the source of the "legislative history" upon which the parties primarily rely to support their assertions of legislative intent, is not part of the statute's legislative history.  See Estate of Hutchinson v. Commissioner, 765 F.2d 665, 669-670 (7th Cir. 1985), affg. T.C. Memo. 1984-55; Condor Intl., Inc. v. Commissioner, 98 T.C. 203, 227 (1992).  See generally Mertens, Law of Federal Income Taxation, sec. 3.20, at 31 (1994):

> The purpose of the Blue Book [the Staff of Joint Committee's general explanation of a tax statute] is to provide, in one volume, a compilation of the legislative history of a piece of tax legislation. While the document is most helpful as a handy reference volume it also gives some guidance.  Where the Blue Book's explanation differs from that in a conference report it may serve to alert the reader that a technical correction is needed to reconcile the views. [Emphasis added.]

Such is especially true as to the General Explanation of the 1986 Act, which was written by the Joint Committee of Taxation for the 100th Congress (Joint Committee), or, in other words, the Congress that next followed the Congress that passed the 1986 Act.[10]  Although the Staff of Joint Committee's explanation of a

---

[10] The Joint Committee consisted of 10 Congressmen, 5 from
(continued...)

tax statute may be entitled to respect as a document that is prepared in connection with the legislative process by individuals who are intimately involved in that process, we shall not hesitate to disregard the expressions set forth therein where, as here, those expressions are barren of corroboration in the legislative history.  Zinniel v. Commissioner, 89 T.C. 357, 367 (1987), affd. 883 F.2d 1350 (7th Cir. 1989); see also Estate of Wallace v. Commissioner, 965 F.2d 1038, 1050-1051 n.15 (11th Cir. 1992), affg. 95 T.C. 525 (1990).

Even if we were to follow the lead of the parties and rely on the General Explanation of the 1986 Act for an expression of legislative intent as to the current AMT regime, we would still not reach their proffered conclusion that Congress intended that the regular tax and AMT regimes operate as parallel systems.  In fact, the primary provision of the General Explanation of the 1986 Act that the parties quote in support of their contention that the systems are "parallel" does not even use that word.  Moreover, that provision actually contradicts the parties'

---

[10](...continued)
the Senate and 5 from the House of Representatives.  Staff of Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1986 (J. Comm. Print 1987) (General Explanation of the 1986 Act) II.  The General Explanation of the 1986 Act was prepared by the Staff of Joint Committee, in consultation with the staffs of the House Ways and Means Committee and the Senate Finance Committee.  Letter from David H. Brockway, Chief of Staff, to the Hon. Dan Rostenkowski, Chairman, and the Hon. Lloyd Bentsen, Vice-Chairman.  Id. at XVII.

position by stating "For most purposes, the tax base * * * is determined as though the alternative minimum tax were a separate and independent income tax system."  General Explanation of the 1986 Act, supra at 438 (emphasis added).  To our minds, the phrase "For most purposes" means that even the Joint Committee recognized that the regular tax and AMT systems were not parallel systems for all purposes.  The same is true as to the use of the term "as though", rather than a term such as "by virtue of the fact that".  As to the Joint Committee's use of the term "separate and independent", we find no statement in the General Explanation of the 1986 Act to the effect that the two regimes are separate and independent for all purposes.  And even if we did, the mere fact that two systems are "separate and independent" does not make them "parallel".

The General Explanation of the 1986 Act uses the word "parallel" only twice in its discussion of AMT.  First, as to the treatment of AMT NOLs, the General Explanation of the 1986 Act states:

> In light of the parallel nature of the regular tax and minimum tax systems, any limitations applying for regular tax purposes to the use by a consolidated group of NOLs or current year losses (e.g., section 1503) apply for minimum tax purposes as well.  Moreover, an election under section 172(b)(3)(C) to relinquish the carryback period applies for both regular tax and minimum purposes.  [General Explanation of the 1986 Act, supra at 470.]

Second, in its discussion of "other rules", the General

Explanation of the 1986 Act states:

> Under the Act, the application of the tax benefit
> rule to the minimum tax is within the discretion of the
> Secretary of the Treasury.  Relief from either the
> regular or the minimum tax, when the source of the
> taxpayer's tax liability changes, between taxable
> years, from one system to the other, is not appropriate
> solely by reason of the fact that a taxpayer has
> received no benefit under one of the systems with
> respect to a particular item.  Congress both intended
> that the regular and minimum taxes constitute separate
> and parallel tax systems, and anticipated that the
> source of some taxpayers' liability would change from
> year to year.  Relief from the possible adverse impact
> of switching from one system to the other (e.g., the
> denial of deductions with respect to which there are
> timing differences as between the two systems) was
> intended to be provided by means of the minimum tax
> credit, along with the use of adjustments that give
> rise, in effect, to "negative preferences" with respect
> to items such as depreciation.  Thus, application of
> the tax benefit rule in this context is not necessary,
> although the Treasury may, at its discretion, identify
> particular circumstances where such exercise is
> appropriate.  [Id. at 472.]

Given the clarity of the statute in the direct reference to

and the definition of the term "taxable income", we consider none

of the uses of the word "parallel" by Congress or the Joint

Committee to be a clear directive from Congress that it intended

that the computation of AMTI would, as the parties suggest,

"start from scratch".  Moreover, in the case of AMT NOLs, the

rules for those NOLs did and still do run parallel.[11]  Thus, the

mere fact that the prior and current systems of AMT NOLs are

_____

[11] The same is true as to AMT FTCs.

parallel to their treatment for regular tax purposes does not, in our minds, mean that the entire AMT regime runs parallel to the regular tax regime.[12]

Although the legislative history to a statute is secondary when the Court can apply the plain meaning of unambiguous statutory text, we recognize that unequivocal evidence of a clear legislative intent may sometimes override a plain meaning interpretation and lead to a different result.  Consumer Prod. Safety Commn. v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980); see also Halpern v. Commissioner, 96 T.C. 895, 899 (1991); Hirasuna v. Commissioner, 89 T.C. 1216, 1224 (1987); Huntsberry v. Commissioner, 83 T.C. 742, 747-748 (1984).  Here, the legislative history of the statutes provides scant and unpersuasive support for a holding contrary to that which we reach herein.

As to section 280C(a), its genesis lies in the Tax Reduction and Simplification Act of 1977 (1977 Act), Pub. L. 95-30, 91 Stat. 126, which also is the statute that spawned the new jobs credit of former sections 44B, 51, 52, and 53.  Given the presence at that time of high marginal tax rates and the

---

[12] Nor are we persuaded by the preamble or technical advice memorandum upon which petitioners rely.  In addition to the obvious fact that these documents also are not items of legislative history, these documents are afforded little weight in this Court.  Textron Inc. v. Commissioner, 115 T.C. 104, 110 (2000) (technical advice memorandum); Dobin v. Commissioner, 73 T.C. 1121, 1129 n.9 (1980) (preamble to proposed regulations).

percentage of wages that could qualify for the new jobs credit, Congress believed that some employers might want to pay an employee not needed for work simply to avail itself of the credit. Such a case could occur, for example, where the combined tax benefit from both the full deduction and credit exceeded the cost of the wages; e.g., where an employer subject to a 70-percent marginal tax rate received a 50-percent new jobs credit for qualifying wages. Congress enacted section 280C to thwart this possibility. S. Rept. 95-66, at 68-69 (1977), 1977-1 C.B. 469, 488-489. One year later, Congress amended the provisions relating to the new jobs credit to replace it with the TJC. The legislative history accompanying this amendment does not elaborate as to the reason for a wage-expense limitation in the case of the TJC but states simply that such a reduction is required. H. Conf. Rept. 95-1800, at 231-232 (1978), 1978-3 C.B. (Vol. 1) 565-566; S. Rept. 95-1263, at 127 (1978), 1978-3 C.B. (Vol. 1) 315, 425.

As to the provisions on AMT, those provisions find their roots in the Tax Reform Act of 1969 (the 1969 Act), Pub. L. 91-172, 83 Stat. 487, where Congress set forth rules for a minimum tax (MT) which was imposed in addition to the taxpayer's regular tax. The Code has included MT provisions for both corporate and individual taxpayers ever since. The current minimum tax; i.e., the AMT, has generally evolved into its

current form through three pieces of legislation; namely, the Revenue Act of 1978 (1978 Act), Pub. L. 95-600, 92 Stat. 2763; the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, 96 Stat. 324; and the 1986 Act.

Through the 1969 Act, Congress enacted the MT provisions to prevent corporate and individual taxpayers from aggregating deductions to the point where they would pay either no tax or a "shockingly low" tax. First Chicago Corp. v. Commissioner, 842 F.2d 180, 181 (7th Cir. 1988), affg. 88 T.C. 663 (1987). Congress aimed through the MT provisions to allocate the tax burden among taxpayers more equitably by taxing preference items (preferences) consisting of certain deductions and an exclusion from gross income. See S. Rept. 91-552, at 112 (1969), 1969-3 C.B. 423, 495. The preferential deductions generally included deductions which involved no economic cost to the taxpayer (e.g., the long-term capital gains deduction) or exceeded current economic cost. The MT equaled the product of a single tax rate multiplied by the amount of the taxpayer's preferences which exceeded a prescribed deduction.

This scheme remained in effect, with only minor changes, as the only minimum tax formulation in the Code until 1978. See 1978 Act sec. 421(a), 92 Stat. 2871. Through the 1978 Act, Congress supplemented the MT with an AMT for noncorporate

taxpayers.[13]  In contrast to the MT, the AMT was imposed on a tax base similar to taxable income.  The most notable differences between the bases were that, in computing AMTI, a long-term capital gain deduction was not allowed and itemized deductions could be effectively disallowed.  As to both taxable bases, the NOL deduction and the basis of property were the same.

Through TEFRA, Congress repealed the MT for noncorporate taxpayers and replaced it with a revised form of AMT.  For the computation of AMTI, Congress generally:  (1) Incorporated the old MT preferences by causing those amounts to increase AMTI relative to taxable income and (2) created new preferences which were either not deductible or not excludable from gross income.  Congress also disallowed certain itemized deductions allowable in computing taxable income and provided for a separate alternative tax NOL deduction.

The TEFRA AMT provision remained in effect from 1982 until its amendment by the 1986 Act, which expanded the AMT for individuals.  S. Rept. 99-313, at 515, 521 (1986), 1986-3 C.B. (Vol. 3) 515, 521.  Through that act, Congress repealed the MT

------

[13] Although the Revenue Act of 1978, Pub. L. 95-600, 92 Stat. 2763, purported to repeal the add-on minimum tax for individuals and replace it with a new AMT formulation beginning in 1979, other sources indicate that the two provisions co-existed in the Code until the add-on minimum tax was finally repealed by the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, sec. 201(a), 96 Stat. 411, and supplanted by an amended alternative minimum tax.  See, e.g., Day v. Commissioner, 108 T.C. 11, 14 (1997), and the cases cited therein.

for corporate taxpayers and subjected them to AMT.  Congress also altered the computation of AMTI by providing for differences regarding when items of income or deductions are taken into account in computing taxable income and AMTI.   The post-1986 AMT rules, sections 55-59, were enacted to achieve one overriding objective: to establish a floor for tax liability, so that a taxpayer pays some tax regardless of the tax breaks otherwise available to him under the regular tax system.  S. Rept. 99-313, supra at 518, 1986-3 C.B. (Vol. 3) at 518.  The AMT rules accomplish this goal by eliminating favorable treatment to certain items that are treated favorably for purposes of the regular tax (tax preference items).  Secs. 55(b)(2)(B), 57(a).

The legislative history under the 1986 Act states explicitly that the computation of a corporation's AMTI begins with taxable income and that any adjustments required by the AMT regime are made from there.  The report of the House Ways and Means Committee, for example, explains clearly and unambiguously that the starting point for computing a corporation's AMTI is "taxable income".  The report states:

Explanation of Provisions

1.  Overview

The bill repeals the present law add-on minimum tax for corporations beginning in 1986, creates a new alternative minimum tax on corporations, and expands the alternative minimum tax on individuals.

Corporations.--Generally, <u>the tax base for the alternative minimum tax on corporations is the taxpayer's regular taxable income, increased by the taxpayer's tax preferences for the year and adjusted by computing certain deductions in a special manner which negates the acceleration of such deductions under the regular tax</u>. The resulting amount, called alternative minimum taxable income, then is reduced by a $40,000 exemption and is subject to tax at a 25-percent rate. The amount so determined may then be offset by the minimum tax foreign tax credit to determine a "tentative minimum tax." These rules are designed to ensure that, in each taxable year, the taxpayer must pay tax equaling at least 25 percent of an amount more nearly approximating its economic income (above the exemption amount).

The net minimum tax, or amount of minimum tax due, is the amount by which the tax computed under this system (the tentative minimum tax) exceeds the taxpayer's regular tax. Although the minimum tax is, in effect, a true alternative tax, in the sense that it is paid only when it exceeds the regular tax, technically the taxpayer's regular tax continues to be imposed, and the net minimum tax is added on.

Individuals.--The structure for the alternative minimum tax on individuals generally is the same as under present law, except that certain deferral preferences (such as incentive depreciation) give rise to adjustments to the minimum tax base over a period of years, in order properly to compute total income each year in light of the fact that, in later years, the regular tax deduction typically is smaller than the deduction would be if calculated on a straight line basis over a longer period. The alternative minimum tax on individuals differs from that applying to corporations in several respects. For example, there are some differences between the preferences applying to individuals and those applying to corporations, and certain itemized deductions that individuals can claim for regular tax purposes are not allowable under the minimum tax. [H. Rept. 99-426, at 308 (1986), 1986-3 C.B. (Vol. 2) 308; emphasis added.]

The Senate Finance Committee repeated these statements almost verbatim in its report.[14]  S. Rept. 99-313, supra at 521, 1986-3 C.B. (Vol. 3) 521.  Although these reports do not explicitly provide that the computation of an individual's AMTI also begins with taxable income, we decline to conclude that the calculation of AMTI is different for an individual given no clear provision to that effect in either the statute or the legislative history. Whereas the House and Senate committee reports both state that the two regimes are considered "separate" systems, this simply means, as respondent acknowledges, that two taxes are involved. The mere fact that the two systems may also be "independent" does not necessarily mean that they are unrelated in all regards, or, in other words, parallel.

Petitioners also rely on the fact that section 1.55-1(b), Income Tax Regs., does not prohibit them from deducting all of the wages for AMT purposes.  Petitioners recognize in this regard that Congress authorized the Treasury Department to issue regulations on the AMT regime, that the Commissioner issued two

---

[14] The General Explanation of the 1986 Act also includes these statements and clarifies that the word "generally" as used in the discussion on corporations means that regular taxable income is not used only where the taxpayer's tax base is other than taxable income; e.g., unrelated business taxable income, real estate investment trust taxable income, or life insurance company taxable income.  General Explanation of the 1986 Act, supra at 436-437.  The General Explanation of the 1986 Act states that a technical correction may be necessary to effectuate the exception to the general rule.  Id. at 436 n.5.

rulings, Tech. Adv. Mem. 93-20-003 (May 21, 1993) and Priv. Let. Rul. 93-21-063 (May 28, 1993), before exercising this authority, that these rulings concluded that, for AMT purposes, the relevant taxpayers must make a separate computation of adjusted gross income in order to ascertain the charitable contribution limitation under section 170(b)(1), and that the Commissioner effectively overruled those rulings through the issuance of section 1.55-1(b), Income Tax Regs.

We read nothing in section 1.55-1, Income Tax Regs., that is inconsistent with our opinion herein. That section provides:

> SEC. 1.55-1. Alternative minimum taxable income.--(a) General rule for computing alternative minimum taxable income. Except as otherwise provided by statute, regulations, or other published guidance issued by the Commissioner, all Internal Revenue Code provisions that apply in determining the regular taxable income of a taxpayer also apply in determining the alternative minimum taxable income of the taxpayer.
>
> (b) Items based on adjusted gross income or modified adjusted gross income. In determining the alternative minimum taxable income of a taxpayer other than a corporation, all references to the taxpayer's adjusted gross income or modified adjusted gross income in determining the amount of items of income, exclusion, or deduction must be treated as references to the taxpayer's adjusted gross income or modified adjusted gross income as determined for regular tax purposes.
>
> (c) Effective date. These regulations are effective for taxable years beginning after December 31, 1993.

Petitioners' final argument is that the Court will frustrate congressional intent by not allowing them to deduct Foods' full

wage expense.  Petitioners contend that disallowing part of the deduction may place taxpayers in a worse position by electing the TJC than by not making the election.  We disagree that our holding herein frustrates congressional intent.  The primary way to foster congressional intent is to apply, as we do here, the plain meaning of the statute as written.  In this regard, the Supreme Court has stated:  "courts must presume that a legislature says in a statute what it means and means in a statute what it says there."  Conn. Natl. Bank v. Germain, 503 U.S. 249, 253-254 (1992) (citations and quotation marks omitted).

We sustain respondent's determination on this issue.  In so doing, we have considered all arguments made by the parties and have rejected those arguments not discussed herein as without merit.  Accordingly,

> Decisions will be entered for
> respondent in docket Nos. 1287-00,
> 1288-00, 1289-00, 1290-00, 1293-00, and
> 1618-00, and decisions will be entered
> under Rule 155 in docket Nos. 1291-00
> and 1292-00.