156 T.C. No. 12

UNITED STATES TAX COURT

RICHARD S. HUSSEY, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 19249-18.                          Filed June 24, 2021.

In 2012 P sold 16 investment properties and received from the mortgage lender a discharge of indebtedness totaling $754,054 for 15 of those properties. In 2013 P sold seven investment properties. P did not receive from the lender a discharge of indebtedness relating to the 2013 property sales.

The parties agree that in 2012 P received a discharge of qualified real property business indebtedness (QRPBI). The discharge of QRPBI may be excluded from income if the taxpayer's bases in depreciable real properties are reduced by the amount of the debt discharge. I.R.C. sec. 108(a)(1)(D), (c)(1). A basis reduction occurs only to the extent that the taxpayer's aggregate bases in depreciable real properties equal or exceed the amount of debt discharged. I.R.C. sec. 108(c)(2)(B). P's aggregated bases exceeded the amount of QRPBI in 2012.

The basis reduction generally occurs in the year following the discharge of indebtedness. I.R.C. sec. 1017(a). However, as an exception to that general rule, the basis reduction for discharge of QRPBI occurs in the same year as the sale of "property taken into account under I.R.C. sec. 108(c)(2)(B)". I.R.C. sec. 1017(b)(3)(F)(iii). Thus, the basis reduction occurs in the year the debt is discharged if the taxpayer sells, in the same year as the discharge, depreciable real property that had been used to prove the taxpayer had aggregated bases that exceeded the discharge amount.

P's Form 1040X, Amended U.S. Individual Income Tax Return, for 2012 and his Forms 1040, U.S. Individual Income Tax Return, for the years at issue, 2013 and 2014, were prepared by a tax law firm to which P was referred with the assistance of his long-time financial adviser and a large accounting firm.

The parties dispute how provisions relating to the timing of the basis adjustment for discharge of QRPBI in I.R.C. secs. 108 and 1017 apply; whether the lending bank discharged any of P's debt in 2013; and whether P is liable for accuracy-related penalties under I.R.C. sec. 6662 for 2013 and 2014.

1. Held: P is required to reduce the bases of depreciable real properties in 2012. See I.R.C. sec. 1017(b)(3)(F)(iii).

2. Held, further, the lending bank did not discharge any of P's QRPBI in 2013.

3. Held, further, P is not liable for accuracy-related penalties under I.R.C. sec. 6662 for 2013 and 2014 because he relied in good faith on professional tax advice in preparing his returns for those years.

Catherine E. Chollet, for petitioner.[1]

Catherine S. Tyson and Philip Edward Blondin, for respondent.

OPINION

COLVIN, Judge:  Respondent determined that petitioner had income tax deficiencies and is liable for penalties for taxable years 2013 and 2014 as follows:[2]

|  |  | Penalty |
| Year | Deficiency | sec. 6662 |
| 2013 | $59,905 | $11,981 |
| 2014 | 33,969 | 6,794 |

The issues for decision are:

1.  Whether, under sections 1017(a) and (b)(3)(F)(iii) and 108(c)(2)(B), petitioner must reduce his bases in real properties for 2012 or 2013 as a result of his sale of depreciable real properties in 2012.  We hold that the basis adjustments must be made for 2012.

_____

[1]Thomas J. Carnes appeared only for a procedural issue prior to the trial of the tax issue.

[2]Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26, U.S.C., in effect for the years in issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

2. Whether petitioner received a discharge of debt in 2013. We hold that he did not.

3. Whether petitioner is liable for accuracy-related penalties under section 6662 for taxable year 2013 or 2014. We hold that he is not.

## Background

Some of the facts have been stipulated and are so found.

A.  Petitioner's Investment Properties

In 2009 petitioner purchased[3] 27 investment properties on which he assumed outstanding loans totaling $1,714,520. All of the loans were held by the same bank (the lending bank). By 2012 petitioner was struggling to make payments on the loans.

In 2012 petitioner sold 16 of the properties, 15 of which he "sold short", i.e., sold at a loss. The total sale proceeds for the 16 properties were $241,861. After the sales, petitioner's loans were modified and replaced with two notes: Note A, totaling $265,600, which replaced the original loan assumption; and Note B,

------

[3]The properties were purchased by Cobriel, LLC, a Missouri limited liability company (LLC), of which petitioner is the only member. Because there is only one member, and because the LLC has never filed Form 8832, Entity Classification Election, see Castello v. Commissioner, T.C. Memo. 2016-184, at *10, the LLC is disregarded for tax purposes, see secs. 301.7701-1, 301.7701-2, and 301.7701-3, Proced. & Admin. Regs. Herein we treat the properties as owned by petitioner as an individual.

totaling $575,864, which replaced a line of credit petitioner had established with the lending bank. The lending bank issued to petitioner 15 Forms 1099-C, Cancellation of Debt, for 2012 (one for each property sold at a loss), which stated that he had a total discharge of debt of $754,054. In 2013 petitioner sold short seven of the remaining properties for $241,500. After the sales, petitioner requested and the bank agreed to a loan modification, pursuant to which $10,200 from Note B was transferred to a new note, Note C. At that time, $539,341 remained on Note B and the bank documented that Note B was "[r]eplaced with Note C - no more payments on Note B." Bank records showed that there was a "Net Charge-Off" of $529,665 for Note B, and also that "[p]ayments received (up to $529,66[5]) will be posted as a[n] LLR [Loan Loss Reserve] Recovery". The lending bank did not issue any Forms 1099-C to petitioner for 2013. Around October 25, 2015, the bank wrote that "$493,141[] is the remaining amount to be booked as an LLR Recovery as of: 10/2/2015".

B.     Petitioner's 2012-14 Tax Returns

1.     Original and Amended 2012 Tax Return[4]

Petitioner, through his then accountant, filed his Form 1040, U.S. Individual Income Tax Return, for 2012 on October 13, 2013.  The Form 4797, Sales of Business Property, filed with that return, stated that petitioner had sold 17 investment properties (16 associated with the lending bank and 1 he had purchased earlier) for a gain totaling $83,675.

Petitioner has no background in tax or accounting.  When petitioner suspected that his original return for 2012 was incorrect, he contacted his long-time financial adviser to seek his opinion.  His financial adviser told petitioner that he also believed that the return was not correct.  The adviser called an acquaintance who was a certified public accountant (C.P.A.) at a large accounting firm and scheduled an appointment for petitioner.  Petitioner and his financial adviser met with that individual, who reviewed petitioner's 2012 tax return.  The individual stated that he believed the return was incorrect and recommended that petitioner meet with a tax attorney at the Kohn Partnership because of the complexity of the issues relating to that return.

---

[4]Facts relating to the 2012 return are included because they relate to petitioner's 2013 and 2014 tax years.

Petitioner and his financial adviser met with Michael Kohn of the Kohn Partnership. Mr. Kohn had more than 30 years of experience as a practicing tax attorney. During the meeting Mr. Kohn described what he said were various errors on petitioner's 2012 tax return. He also described how he believed tax law applied to petitioner's real estate transactions at issue here. As a result of this meeting, petitioner hired the Kohn Partnership to prepare Form 1040X, Amended U.S. Individual Income Tax Return, for 2012 and to prepare his Forms 1040 for taxable years 2013 and 2014. Mr. Kohn called petitioner several times to request documents while he worked on petitioner's tax returns. Petitioner provided the requested documents.

Petitioner filed the Form 1040X for 2012 prepared by the Kohn Partnership on January 14, 2015. The Form 4797 attached to the amended return stated that petitioner had sold 17 properties for a loss totaling $613,263. On Form 982, Reduction of Tax Attributes Due to Discharge of Indebtedness (and Section 1082 Basis Adjustment), petitioner reported that he had excludable income of $685,281 "for a discharge of qualified real property business indebtedness applied to reduce the basis of depreciable real property" (i.e., the debt discharged from the lending bank).

2.    2013 Tax Return

On October 15, 2014, petitioner filed his Form 1040 for 2013, which had been prepared by the Kohn Partnership. On the Form 4797 included with that return petitioner reported that in 2013 he had sold six investment properties[5] and his primary residence (which was also listed as an investment property) for a loss totaling $499,417 ($437,650 for the investment properties and $61,767 for his primary residence).

3.    2014 Tax Return

On October 15, 2015, petitioner filed his Form 1040 for 2014, which had been prepared by the Kohn Partnership. Petitioner reported a net operating loss carryforward of $423,431 from 2013. On Form 982 petitioner reported he had excludable income of $65,914 from a discharge of qualified real property business indebtedness (QRPBI). A Form 1099-C shows that petitioner received a discharge of debt of $65,914 from the 2014 sale of his primary residence (the same residence reported as sold in his 2013 tax return).

---

[5]The record establishes that petitioner sold seven (not six) investment properties in 2013. The investment property not reported on the 2013 return is identified in the record as 4315 Gannett.

C.     Notice of Deficiency

On July 3, 2018, respondent issued a notice of deficiency to petitioner for taxable years 2013 and 2014.  For 2013 respondent disallowed the loss deductions claimed on petitioner's Form 4797.  For 2014 respondent disallowed the loss carryover deduction from 2013.[6]

## Discussion

The taxable years at issue are 2013 and 2014.  The issues for decision are (1) when (i.e., in which year), under sections 108 and 1017, petitioner is required to reduce the bases in his depreciable real properties for sales of those properties in 2012; (2) whether the lending bank discharged any of petitioner's QRPBI in 2013; and (3) whether petitioner is liable for accuracy-related penalties under section 6662.

A.     Whether Petitioner Is Required To Reduce His Bases for the Year the Debt Was Discharged or for the Subsequent Year

We next decide when--that is, whether for 2012 or 2013--petitioner must make basis reductions as a result of the bank's discharge of QRPBI and his sales of depreciable real properties in 2012.  While petitioner's tax year 2012 is not

---

[6]Because respondent's determination for 2014 depends upon our analysis of the 2013 taxable year, whether the carryover is allowed is a computational adjustment and not an issue for decision.

before us in this case, we must decide this issue in order to decide the amount of petitioner's tax liability for 2013.  See sec. 6214(b); Hill v. Commissioner, 95 T.C. 437, 439-440 (1990).

Sections 61(a)(10) and 108(a)(1)(D) provide an exclusion from income for forgiveness of QRPBI.  When that exclusion applies, the taxpayer must reduce his or her bases in the depreciable real properties.  Sec. 108(c)(1).  The parties agree that petitioner's indebtedness on the 15 investment properties sold short in 2012 was QRPBI.  See sec. 108(c)(1).  The parties also agree that petitioner may exclude the discharge of his QRPBI from income.  See secs. 61(a)(10), 108(a)(1)(D).  Finally, the parties agree that petitioner must reduce his bases in the depreciable real properties as a result of that exclusion.  See sec. 108(c)(1).  However, the parties dispute the year for which the basis reductions must be made.  Petitioner contends that the basis reductions must be made for 2013.  Respondent contends they must be made for 2012.

Petitioner points out that section 1017(a) states generally that basis reductions resulting from the discharge of QRPBI are made the year after the debt is discharged.  If section 1017(a) applies here, the basis adjustments at issue would, as petitioner contends, be made in 2013.  However, section 1017(b)(3)(F) provides three additional rules which govern reduction of basis following

discharge of QRPBI.[7]  First, real property, the aggregate bases of which are considered under section 108(c)(2)(B), includes only depreciable real property. Sec. 1017(b)(3)(F)(i).  Second, the depreciable real property may not be held as inventory.  Sec. 1017(b)(3)(F)(ii).

Third, section 1017(b)(3)(F)(iii) provides that, in the case of "property taken into account under section 108(c)(2)(B), the [basis] reduction with respect to such property shall be made as of the time immediately before [the] disposition if earlier than the time under" section 1017(a) (i.e., the year following the discharge). Application of this third rule requires consideration of whether "property [was] taken into account under section 108(c)(2)(B)"; and if it was, then the "reduction with respect to such property shall be made as of the time immediately before [the] disposition [e.g., sale] if earlier than the time under" section 1017(a).

Thus we must decide whether, as stated in the third rule, section 1017(b)(3)(F)(iii), property was taken into account under section 108(c)(2)(B). Section 108(c)(2)(B) provides:

> Overall limitation.--The amount excluded under subparagraph (D) of
> subsection (a)(1) [discharge of QRPBI] shall not exceed the aggregate

---

[7]Where two provisions overlap in application, here, sec. 1017(a) and (b)(3)(F), the more specific provision (sec. 1017(b)(3)(F)) takes precedence over the more general provision.  Bulova Watch Co. v. United States, 365 U.S. 753, 758 (1961).

adjusted bases of depreciable real property (determined after any reductions under subsections (b) and (g)) held by the taxpayer immediately before the discharge (other than depreciable real property acquired in contemplation of such discharge).

In other words, the amount of discharged QRPBI excluded from a taxpayer's income may not exceed the aggregate bases of the taxpayer's depreciable real properties held immediately before the discharge. The bank discharged $754,054 of petitioner's QRPBI in 2012. The record suggests, and the parties do not dispute, that petitioner's aggregate bases in depreciable real properties for 2012 immediately before the discharge exceeded the $754,054 discharge of QRPBI.

Section 1017(b)(3)(F)(iii) also provides that in the case of "property taken into account under section 108(c)(2)(B)" (i.e., depreciable real property which was used to show that he had aggregated bases in excess of the discharge amount) in the same year as the discharge, the basis reductions must occur immediately before the sales of the properties and not in the year following the sales. Because in 2012 petitioner (1) received a discharge of QRPBI and (2) sold properties the bases of which were used to show he had aggregated bases that exceed the discharge amount, he was required to reduce his bases in the disposed properties immediately before the sales of those properties in 2012, not in 2013. His reported

bases for the properties sold in 2012 should have reflected these reductions, and any remaining reductions should have been reflected in the bases of his remaining properties for 2013.[8]

Our analysis of the question when the basis adjustment is required to be made begins with the governing statutory text. See, e.g., Allen v. Commissioner, 118 T.C. 1, 7 (2002). Even though we see no ambiguity in the application here of that text, we find it helpful to review Congress' statement about the statute's purpose in the legislative history accompanying the enactment of these provisions in 1993. See United States v. Am. Trucking Ass'ns, Inc., 310 U.S. 534, 543-544 (1940). Legislative history shows that the provisions central to this case were enacted in 1993 to provide relief to owners of certain real estate which had declined in value. Consistent with this purpose, section 108(c)(2)(A) limits the income exclusion to the amount by which the value of the property is less than the indebtedness on the property (i.e., the amount the property is "underwater"). The

---

[8]"[F]or basis reductions under section 108(c), a taxpayer must reduce the adjusted basis of the qualifying real property to the extent of the discharged qualified real property business indebtedness before reducing the adjusted bases of other depreciable real property." Sec. 1.1017-1(c)(1), Income Tax Regs. The parties do not contend that petitioner had sufficient bases in the properties sold in 2012 to cover the 2012 debt discharge; therefore, the basis reductions in excess of those applied to the properties sold in 2012 should be reflected in properties owned at the beginning of 2013.

form of relief was to convert the consequence of the discharge of certain

indebtedness (QRPBI) from income, as would generally result under section 108,

to a basis adjustment. These provisions also determine the timing of the basis

adjustments by taking into account the amounts of the taxpayer's bases in real

estate at the time of discharge of the QRPBI. The Report of the House Budget

Committee for the Omnibus Budget Reconciliation Act of 1993[9] accompanying

the enactment of those sections states:

> The committee believes that where an individual has discharge of
> indebtedness that results from a decline in value of business real
> property securing that indebtedness [i.e., QRPBI], it is appropriate to
> provide for deferral, rather than current inclusion, of the resulting
> income. Generally, that deferral should not extend beyond the period
> that the taxpayer owns the property.

>     \*     \*     \*     \*     \*     \*     \*

> The amount of debt discharge excluded under the provision is
> applied, using the rules of section 1017 (as modified by the
> provision), to reduce the basis of business real property held by the
> taxpayer at the beginning of the taxable year following the taxable
> year in which the discharge occurs. The election under sec.
> 1017(b)(3) to treat inventory as qualified property does not apply. <u>If
> the taxpayer disposes of real property</u> (in the transaction that gave rise
> to the discharge or otherwise) <u>prior to the first day of the next taxable
> year, then the reduction in basis of such property is made as of the
> time immediately before the disposition</u>.

---

[9]The House Ways and Means Committee provided the text for the tax
provisions in the Report. <u>See</u> H.R. Rept. No. 103-111, at 593 (1993), 1992
U.S.C.C.A.N. 378, 824.

H.R. Rept. No. 103-111, at 623-624 (1993), 1993 U.S.C.C.A.N. 378, 854-855 (emphasis added).[10]  As stated in the Committee Report, the taxpayer must make a basis adjustment for the year depreciable real property is sold if the property is sold in the same year as the discharge.

Petitioner contends, however, that because the aggregated bases in his remaining properties (i.e., the unsold properties) in 2012 exceeded the discharged amount, he did not need to reduce his bases until the following year.  Petitioner's argument misconstrues sections 108(c)(2)(B) and 1017(b)(3)(F)(iii).  The property referred to in section 108(c)(2)(B) is ascertained before the debt is discharged.  When section 1017(b)(3)(F)(iii) refers to the properties identified in section 108(c)(2)(B), that reference is to a set group of properties that is fixed once the debt is discharged.  Selling properties from that group triggers section 1017(b)(3)(F)(iii) with respect to the bases of the properties sold regardless of the remaining bases in the properties not sold.  Nowhere in section 1017(b)(3)(F)(iii) or section 108(c)(2)(B) is there a reference to the "remaining" bases after the sale

---

[10]See also Gerald J. Robinson, Federal Income Taxation of Real Estate, para. 9.06[4][b] (2021), Westlaw FITRE WGL ("If the taxpayer disposes of depreciable real property, either in the transaction giving rise to the discharge of indebtedness or otherwise, prior to the first day of the next taxable year, the reduction in basis is accelerated:  It is made as of the time immediately before the disposition.").

(i.e., disposition) of properties. Thus, petitioner was required under section 1017(b)(3)(F)(iii) to reduce his bases immediately before the sale of the investment properties in 2012.

B.     Whether Petitioner Had Discharge of Indebtedness in 2013

    1.     Whether Petitioner May Claim That the Lending Bank Did Not Discharge Debt in 2013

Respondent contends that petitioner may not claim that the lending bank did not discharge any of his debt in connection with the sale of seven properties in 2013 because petitioner did not raise this issue in the petition. See Rule 34(b)(4). Petitioner raised this issue for the first time before the Court in his pretrial memorandum, and he had previously raised it with respondent. We disagree with respondent's contention because respondent has fully addressed petitioner's claim on several occasions.

We may refuse to consider an issue not raised in the pleadings and raised with the Court for the first time in the party's pretrial memorandum, if our consideration of the issue would surprise or prejudice the opposing party. Fox Chevrolet, Inc. v. Commissioner, 76 T.C. 708, 733-736 (1981). Respondent does not claim surprise or prejudice from petitioner's argument. Instead, respondent merely objects to the timing of petitioner's raising of this issue. A review of the

record shows that respondent was well aware of this argument before it was presented to the Court because respondent's pretrial memorandum addressed the argument in full. Respondent has had ample opportunity to develop an argument and address this issue. Respondent does not contend, nor does it appear, that respondent was unable to find and provide evidence regarding this issue. Respondent's argument fully relies upon evidence proffered by the parties early in this case. Therefore, we deny respondent's objection and we proceed to the merits of the parties' arguments on whether the lending bank discharged any of petitioner's debt in 2013.

2.    <u>Whether the Lending Bank Discharged Any of Petitioner's Debt in 2013</u>

Respondent contends that the lending bank discharged some of petitioner's QRPBI in 2013 because petitioner's debt was restructured in 2013 and the bank charged off (i.e., considered unlikely to be paid) the remaining amount on Note B (i.e., $529,665). If we agreed with respondent, we would decide whether petitioner had for 2013 a basis reduction from the debt discharge and the sales of properties in 2013. <u>See</u> <u>supra</u> Part A. After considering other evidence in the record on this issue, we conclude that the bank did not discharge any of petitioner's debt in 2013.

First, respondent relies on the bank's records, which state that the debt on Note B was "charged off". However, in the light of other facts present here, this entry does not establish discharge of indebtedness income. Kleber v. Commissioner, T.C. Memo. 2011-233, 2011 WL 4485037, at *3 (citing Cozzi v. Commissioner, 88 T.C. 435, 445 (1987)). Additionally, if an amount charged off is retained on a creditors books (i.e., moved to a reserve account), the charge-off is not a discharge of indebtedness. See Int'l Proprietaries, Inc. v. Commissioner, 18 T.C. 133, 139 (1952) ("[T]here is no authorization for a taxpayer[-creditor] to use at the same time a charge-off and a reserve method for the deduction of bad debts." (quoting Commercial Bank of Dawson v. Commissioner, 46 B.T.A. 526, 530 (1942))). While the bank recorded a "net charge off" of $529,665 in 2013, it also recorded that payments up to $529,665 "will be posted as LLR [Loan Loss Reserve] Recovery." Because the lending bank recorded both a net charge-off and a loan loss reserve recovery of $529,665, the presence of the reserve account suggests that the lending bank did not intend to discharge the debt.

The term "loan loss reserve" is familiar to this Court. See, e.g., Bank One Corp. v. Commissioner, 120 T.C. 174 (2003) (discussing "loan loss reserve"), aff'd in part, vacated in part, and remanded sub nom. JP Morgan & Chase Co. v. Commissioner, 458 F.3d 564 (7th Cir. 2006); Cent. Pa. Sav. Ass'n & Subs. v.

Commissioner, 104 T.C. 384 (1995) (same), supplemented by T.C. Memo. 1996-172; Kosman v. Commissioner, T.C. Memo. 1996-112 (same). "[L]oss reserve" is defined as, inter alia, "[a] bank's reserve set aside to cover possible losses, as from defaulting loans." Black's Law Dictionary 1422 (9th ed. 2009).[11] It appears that the lending bank merely moved the "net charge off" amount from one pocket (Note B) to another pocket (the LLR Recovery). We believe that the lending bank would not discharge debt and simultaneously increase by the same amount the LLR, which is an account used to set aside money in anticipation of a default.

Second, the bank did not issue Forms 1099-C to petitioner showing that debt had been discharged in 2013. The nonissuance of Forms 1099-C does not necessarily indicate that debt had not been discharged, see Vaughn v. Commissioner, T.C. Memo. 1992-317, aff'd without published opinion, 15 F.3d 1095 (9th Cir. 1993), but here it is persuasive evidence of that fact because for the prior year, 2012, the bank issued Forms 1099-C showing the discharge in 2012 of petitioner's debt on the investment properties.

---

[11]We often cite Black's Law Dictionary, see, e.g., Moneygram Int'l, Inc. v. Commissioner, 153 T.C. 185, 226 (2019) (quoting Black's Law Dictionary), aff'd, __ F.3d __, 2021 WL 2201277 (5th Cir. June 1, 2021); Blue Lake Rancheria Econ. Dev. Corp. v. Commissioner, 152 T.C. 90, 113-114 (2019) (same); Dynamo Holdings Ltd. P'ship v. Commissioner, 150 T.C. 224, 234 (2018) (same), and its use here is not speculative but, rather, foundational in understanding the case before us.

Respondent contends that the fact that petitioner made short sales in 2013 shows that the bank intended to discharge the debt in 2013, citing Lowry v. Commissioner, T.C. Memo. 2001-238, 2001 WL 1078110, as support. In Lowry, a taxpayer sold a property encumbered by debt. Id., 2001 WL 1078110, at *1. Before the sale, the taxpayer and the creditor holding the debt entered into an agreement that a discharge of indebtedness would occur upon the conveyance (i.e., sale) of the property. Id. at *2. We held that, because the discharge was contingent upon the sale of the property, it occurred when the property was sold and not before. Id. In the case before us, however, the record does not include a contract or other documentation showing when (or whether) the debt would be discharged. While short sales are objectively identifiable events, they alone do not establish that the lending bank intended to discharge the remaining portion of Note B.

On the basis of the foregoing, the record shows that the lending bank did not intend to discharge any of petitioner's debt in 2013. Therefore, we hold that petitioner did not have a discharge of indebtedness for 2013.

C.    Whether Petitioner Is Liable for Accuracy-Related Penalties

Respondent determined and contends that petitioner is liable for the accuracy-related penalties under section 6662(a) and (b)(1) and (2) for tax years

2013 and 2014 due to a substantial understatement of income tax or, alternatively, negligence or disregard of rules or regulations. Petitioner contends that he is not liable for these penalties on the grounds that he had reasonable cause and acted in good faith reliance on a qualified tax law firm to prepare his amended 2012 return and his 2013 and 2014 returns. We conclude that petitioner's claim of good faith reliance is justified.

Taxpayers are not liable for penalties under section 6662 for any part of an underpayment if the taxpayer had reasonable cause and acted in good faith. Sec. 6664(c)(1). Reliance on the advice of a professional tax adviser may demonstrate reasonable cause and good faith. Sec. 1.6664-4(b)(1), Income Tax Regs. We may recognize reasonable reliance on professional advice if the taxpayer shows that: (1) the adviser was a competent professional who had sufficient expertise to justify the taxpayer's reliance on him or her; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); see also Estate of Temple v. Commissioner, 67 T.C. 143, 162 (1976).

The parties agree that petitioner satisfies the first and second requirements. Petitioner's tax lawyer here, Mr. Kohn, had more than 30 years of tax and legal

experience when petitioner sought his advice. Petitioner provided Mr. Kohn with the information the Kohn firm needed to prepare petitioner's tax returns. In dispute, however, is whether petitioner actually relied in good faith on the adviser's judgment.

We decide whether a taxpayer relied in good faith by considering all of the facts and circumstances, including the taxpayer's "experience, knowledge, and education". Sec. 1.6664-4(b)(1), Income Tax Regs. Petitioner, suspecting that his 2012 tax return was prepared incorrectly, consulted his financial adviser who agreed with petitioner that his return seemed incorrectly prepared. The financial adviser arranged for petitioner to meet with a C.P.A. at a large accounting firm, who also agreed that petitioner's 2012 tax return was not prepared correctly. The C.P.A. referred petitioner to Mr. Kohn, who also told petitioner that he believed that his 2012 tax return was incorrect, and described what he thought the errors were.

Petitioner has no background in tax or accounting, and, therefore, sought the advice of individuals he believed would have the knowledge needed to provide help. Petitioner reasonably believed Mr. Kohn's explanation was correct, and he relied on Mr. Kohn's advice in good faith. See Schwalbach v. Commissioner, 111 T.C. 215, 230-231 (1998).

Respondent suggests, with no basis in the record and contrary to petitioner's undisputed testimony, that petitioner's description of how he was referred to Mr. Kohn was untrue and that he was shopping for a favorable tax result. We disagree and find petitioner's testimony credible.

Respondent contends that petitioner did not rely upon Mr. Kohn's advice in good faith because he knew or should have known that the tax result was "too good to be true". While that phrase has been applied in appropriate situations, we believe it does not apply here because of the extensive steps petitioner took to ensure he was receiving adequate professional advice.

Respondent points out that there are errors on petitioner's returns prepared by the Kohn Firm. For example, the bases in real properties retained by petitioner in 2013 had not been reduced on petitioner's 2013 return even though they should have been under Mr. Kohn's analysis. Respondent also points out that petitioner's home was erroneously listed as an investment property sold in 2013 and then recorded that it had been sold again in 2014 when reporting debt cancellation on a Form 982. Respondent contends these errors show that petitioner was not acting in good faith. We disagree. We do not believe petitioner is responsible for detecting errors of this nature in the reporting of complicated tax transactions. Taking into account all of the facts and circumstances, we conclude that petitioner

relied in good faith on the Kohn firm to prepare his amended 2012 and his 2013

and 2014 tax returns, and that he is not liable for penalties under section 6662.

To reflect the foregoing,

Decision will be entered under

Rule 155.